**UNITED STATES of America,**
**Plaintiff,**

v.

**Sylvester A. THAYER, Defendant.**

**Crim. A. No. 16839.**

United States District Court
D. Colorado.

Feb. 19, 1963.

Lawrence M. Henry, U. S. Atty. for Dist. of Colorado, Michael C. Villano, Asst. U. S. Atty. for Dist. of Colorado, Denver, Colo., for plaintiff.

Peter James Little and Richard D. Law, Denver, Colo., for defendant.

DOYLE, District Judge.

By Indictment returned on February 27, 1962, defendant was charged with six counts of perjury. The allegations common to all the counts are: that on April 19, 1961, Thayer appeared before a competent tribunal, the United States Securities and Exchange Commission, acting through a competent officer, and was administered an oath; that an inquiry was then being conducted concerning the activities of the Mount Olympus Beryl-Yltrium-Fluorspar Mining Corporation; and possible violations of the Securities Act of 1933 and of the Securities Exchange Act of 1934.

The indictment further alleges that it was material to the investigation to ascertain whether the defendant knew of the offer and sale of securities of the Mount Olympus Corporation and whether he had made representations to prospective purchasers of stock and induced other persons to offer and sell this stock. Further allegations are that the defendant appeared before the officer of the Securities and Exchange Commission and testified falsely.

Count I described the alleged false testimony as arising from the question whether the defendant told a Mr. Cordova that this company would pay dividends of twenty-two cents ($0.22) a year on the first of the year. Defendant denied that he had made any such representation and then launched into an immaterial explanation.

Counts II through VI inclusive, are substantially similar to Count I, except that each of these latter counts specifies a particular question which was asked the defendant and quotes also his answer, which in each instance is a denial.

At the conclusion of the case Count IV of the Indictment was withdrawn. The jury returned verdicts of guilty as to Counts I, II, III and V. A verdict of not guilty was returned on Count VI.

Defendant has now filed a motion for a new trial which questions: 1) the sufficiency of the authority of the officer of the Securities and Exchange Commission who made the investigation on which the indictment is predicated; 2) the materiality of the questions asked; 3) possible prejudice of the jury; 4) adequacy of the warning which the officer gave the defendant prior to his testimony.

There have been oral arguments and at the conclusion of this hearing the Court was of the opinion that points 1, 2 and 3 described above, were without merit. Briefs were however requested, and later submitted by attorneys for the defendant and by the Government with respect to point 4.

The question posed is whether the defendant's rights under the Fifth Amendment have been violated as a result of which the evidence obtained which formed the basis for the prejury indictment was erroneously received at the trial. After having considered the briefs and after having studied other authorities it would seem that the question is somewhat broader than possible violation of defendant's privilege of self-incrimination and that the issue is also whether the methods employed in obtaining and reducing this testimony show unfairness which, quite apart from the prohibitions of the Fifth Amendment, render the evidence so obtained inadmissible.

The statements in question were developed during the course of a seventy-page statutory "deposition" which was taken on April 19, 1961. During the course of the inquiry the defendant was asked a great variety of questions. These dealt with circumstances of sale of the stock of the Mount Olympus Company, the operation of the company, its assets; but in addition, the defendant was asked questions concerning his participation in the operation and promotion of the company and also questions concerning his personal affairs. Interspersed in this other tes-

timony were the pinpoint questions which formed the basis for the present perjury prosecution. Although the defendant was not represented by counsel at this hearing, he was advised of his right to have counsel and he declined the offer which was then made to call his attorney. There was an extensive admonition to the effect that he need not say anything which would tend to incriminate him, and his attention was called to the fact that the testimony which he was about to give would be sworn testimony, and he was told that the giving of false answers would be perjury "which offense carries serious penalties."

The attorney who conducted the inquiry testified at the trial. He identified the alleged statements as sworn testimony which had been given before him. He further testified that on March 14, 1961, the witness had also been called in for examination. On this occasion according to the witness, there were discrepancies between the statement of defendant and the statement of other witnesses. The defendant was called in on April 19, according to the witness, to give him a chance to correct his earlier statements and to supplement them. The witness was then asked by the Court whether he was then anticipating a perjury prosecution. He replied: "I was not anticipating a perjury prosecution." He added that the purpose of the inquiry was to correct the testimony which had been previously given and so as to supplement it. He was then asked if he was then thinking of a perjury prosecution. He added, "It was discussed." He was then asked if that was going through his mind, and the answer was:

"It was going through my mind after the first transcript of testimony had been received. The perjury prosecution was not considered but the fact that the man may have perjured himself was considered in view of the fact that his testimony conflicted with other evidence that we had, and it was suggested to me, and I concurred in this discussion, that we attempt to find out in great-

er detail what Mr. Thayer said, what he did, how he did it, and give him an opportunity to clarify his earlier testimony in this respect."

He was then asked, "Did you call his attention to your suspicion that he had committed perjury prior thereto on his previous examination? Answer:

"I think I did call his attention, as I recall I called his attention to the fact that we weren't satisfied with the original testimony, that it appeared to be in conflict with other evidence that we had and that I was calling him back to ask him additional questions regarding certain matters, particularly regarding representations he had made regarding the part he had played in this selling of this stock and I advised him, as I have already testified, that a failure to give truthful answers, I first stated he would not have to answer, but if he gave false answers wilfully it would constitute perjury."

Further questions together with the responses given are quoted as follows:

"Q. But at that time you were not laying the ground work for a perjury prosecution?

"A. No, we didn't consider that until some time after the second transcript was available.

"Q. Although it had entered your mind?

"A. Not the prosecution of perjury but the fact that the perjury may have been committed—perjury is not an offense of which the SEC office usually—

"Q. I didn't ask you that.

"A. My answer to your question, we were not considering perjury until after the second transcript had become available."

From the record which is before the Court there are indications that the Securities and Exchange Commission was at least thinking about, if not considering, a prosecution for perjury prior to the April 19th interrogation. It can

not be concluded, however, that the defendant was called in with a view to obtaining unequivocal and clearcut perjured testimony which would be suitable for an indictment. Unfortunately, the record is incomplete as to whether the defendant testified falsely (in the view of the Commission, at least) on the prior occasion, that is, on March 14, 1961. This March 14th deposition should be carefully examined in conjunction with the April 19th testimony. There also should be further inquiry as to the progress of the case prior to April 19th and a full picture would demand an inquiry as to the extent to which there had been discussion and decision to pursue the perjury line prior to the April 19th inquiry. If it should appear that the Government was substantially certain prior to the April 19th hearing that the defendant would give false answers, it would then follow that the testimony so induced should not be received in evidence.

■ A perjury indictment following an *ex parte* inquiry or investigation in which the defendant has been the subject of the investigation demands close judicial scrutiny. See VIII Wigmore, §§ 2250, 2251, History and Policy of the Privilege. Cf. Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; United States v. Edgerton, 9 Cir., 80 F. 374. The *ex parte* procedure lends itself to obvious abuses and is capable of giving rise to violation of personal rights. There are many possible injuries; for example, the defendant faces the dilemma whereby he must refuse to testify or confess substantive violations, or commit perjury. VIII Wigmore on Evidence, McNaughton Revision, section 2251 characterizes it as "the three horns of the triceratops—harmful disclosure, contempt, perjury?" If the defendant commits perjury it can be strongly argued that the evidence is tainted since it has been induced by the Government.

■ The fact that the accused has been warned that false answers can result in a perjury prosecution can be of little value in circumstances where the

defendant may have been misled by the fact that the main object of the investigation appeared to be inquiry as to substantive violations. A warning in such circumstances could not be effectual unless it includes a full disclosure to the effect that a perjury charge is then being contemplated and is almost sure to follow if the defendant persists in the answers which he has been giving. The problem is discussed in the dissenting opinion of Judge Learned Hand in United States v. Remington, 2 Cir., 208 F.2d 567 at 573, wherein he comments on the *ex officio* oath and the *ex officio* examination in the 17th century in the Star Chamber and the Ecclesiastical Commission. He points out that the problem arises from the fact that the examination is *ex parte*. He also calls attention to the fact that the Supreme Court has "shown itself extremely sensitive to the opportunities for oppression that such examination offers." He states that it is not only the questionably content of the evidence so obtained but is also the fact that the officers obtaining the evidence are participants and it is thus unfair to allow them to use the fruits of their own wrongs. The analogies cited by Judge Hand are: first, the inadmissibility of illegally-obtained evidence. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, and entrapment as a defense, that is, where the Government has incited or instigated the commission of the crime. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413. Judge Hand's conclusion is that the return of an indictment following testimony before a grand jury furnished the groundwork for and actually invited the perjury. The principle is much clearer in the case at bar wherein successive *ex parte* inquiries occurred.

■■ The Government's position is that the defendant had an option—that he could have simply refused to testify, but that having elected to proceed after having been warned, he thereby waived any privilege which he might have had. United States v. Orta, 5 Cir., 253 F.2d 312; United States v. Parker (7 Cir.)

244 F.2d 943. However, as indicated above, the giving of the warning can not have much significance where the defendant was, so to speak, then within the sights of the Government and did not receive an explanation of the true import of the second inquiry. Thus the investigating agency can not be allowed to "zero-in," so to speak, on the witness without advising him that if he persists he will be prosecuted for perjury. An indictment charging an offense which is entirely the work product of the Government can not be upheld.

Quite apart from the problem which arises from possible violation of the Fifth Amendment, there is still another reason for possible exclusion of the evidence in question. This is pronounced in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. There the Supreme Court, through Mr. Justice Frankfurter, pointed out that in the federal courts at least, the observance of the minimum constitutional requirements may not be sufficient; that in formulating rules for the reception of evidence in federal courts the Court (Supreme Court) must be guided by considerations of justice and fair play. In McNabb there was protracted questioning and the Court said:

> "Quite apart from the Constitution, therefore, we are constrained to hold that the evidence elicited from the petitioners in the circumstances disclosed here must be excluded. For in their treatment of the petitioners the arresting officers assumed functions which Congress has explicitly denied them. They subjected the accused to the pressures of a procedure which is wholly incompatible with the vital but very restricted duties of the investigating and arresting officers of the Government and which tends to undermine the integrity of the criminal proceeding. * * *
>
> * * * * * * *
>
> "The purpose of this impressively pervasive requirement of criminal procedure is plain. A democratic

society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. * * *

> * * * * * * *
>
> "In holding that the petitioners' admissions were improperly received in evidence against them, and that having been based on this evidence their convictions cannot stand, we confine ourselves to our limited function as the court of ultimate review of the standards formulated and applied by federal courts in the trial of criminal cases. We are not concerned with law enforcement practices except in so far as courts themselves become instruments of law enforcement. We hold only that a decent regard for the duty of courts as agencies of justice and custodians of liberty forbids that men should be convicted upon evidence secured under the circumstances revealed here. * * * *"

■■ In the case at bar it can not now be found and concluded that the testimony which formed the basis for the present indictment was illegally obtained and that it is, therefore, inadmissible in evidence and that the indictment upon which the testimony is based should be quashed. It can, however, be concluded that the circumstances are such as to require careful investigation of the circumstances surrounding the taking of the testimony which led to this indictment with a view to determining whether the circumstances comport to the standards of fairness which are referred to by the Supreme Court in the McNabb case. Circumstances of instigation or of entrapment, or circumstances showing disparity of knowledge as between the Government and the accused whereby he lacked realization of the true import of the inquiry, would necessarily require exclusion of the evidence. While the proceedings before the Securities and Exchange Commission are not now being

*condemned,* at the same time hazard of unfairness is being recognized, and where even such a hazard exists the conviction cannot be approved. Therefore, it is

ORDERED that the judgment on the verdicts be vacated and set aside and that the defendant be granted a new trial so that a full inquiry can be had looking to determining the propriety of receiving the evidence in question.