UNITED STATES of America

v.

Kenneth MAHAFFY, Timothy J. O'Connell, Ralph D. Casbarro, David G. Ghysels, Jr., Robert F. Malin, Linus N. Nwaigwe, Michael A. Picone, Keevin H. Leonard, Defendants.

No. 05–CR–613.

United States District Court, E.D. New York.

Aug. 31, 2006.

Richard F. Albert, Morvillo, Abramow-itz, Grand, Iason & Silberberg PC, Jeffrey C. Hoffman, Hoffman Pollok LLP, J. Bruce Maffeo, Elizabeth Nicole Warin, Law Offices of J. Bruce Maffeo, David Bernfeld, Thomas F.X. Dunn, New York, NY, Stephen P. Scaring, Stephen P. Scar-ing, P.C., Garden City, NY, Mildred M. Whalen, Federal Defenders of New York, Inc., Brooklyn, NY, for Defendants.

Michael Anthony Asaro, United States Attorneys Office, Eastern District of New York, for United States of America.

*MEMORANDUM AND ORDER*

GLASSER, Senior District Judge.

### *INTRODUCTION*

In this case, seven defendants—Kenneth E. Mahaffy, Timothy J. O'Connell, David G. Ghysels, Jr., Robert F. Malin, Linus Nwaigwe, Michael A. Picone, and Keevin H. Leonard—have been indicted for con-spiracy to commit securities fraud and, in various combinations, with securities fraud, witness tampering, and Travel Act violations. Before the Court are the de-fendants' motions: 1.) to strike language from the Indictment; 2.) for a bill of par-ticulars; 3.) for severance; 4.) for suppres-sion of Picone's statements; 5.) for sup-pression of O'Connell's statements; and 6.) for pretrial disclosures. The background allegations are fully stated in this Court's opinion, *United States v. Mahaffy, et al.*, No. 05–CR–613, 2006 WL 2224518 (E.D.N.Y. filed Aug. 2, 2006), familiarity with which is presumed.

### *DISCUSSION*

### I. Motions to Strike Language from the Indictment

■ The Defendants move to strike from the Indictment certain language used to designate sections and subsections. Specifically they challenge the propriety of the following captions, each reproduced ex-actly as in the Indictment: *FRONT RUN-NING SCHEME; BRIBE PAYMENTS; THE COVER UP;* and *Lies to Law En-forcement and the SEC.* They argue that these captions are "emphasized through underlining and/or in capital letters," that they are "clearly not necessary to establish the charges," and that they "exist merely to sensationalize the allegations and to in-flame the jury against the Defendants." (*Mahaffy Mem. Supp. Motion* at 11).

■ Rule 7(d) of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment." "[T]he trial court is allowed wide discre-tion in coping with such motions," *United States v. Courtney,* 257 F.2d 944, 947 (2d Cir.1958), but these motions may only be granted "where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial. If evi-dence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *United States v. Scarpa,* 913 F.2d 993, at 1013 (2d Cir.1990) (internal quotations and citations omitted).

The challenged language is indisputably relevant to the charges; the allegations of front-running, bribery, and lying to inves-tigators are prejudicial only because they are, essentially, the criminal activities with which the defendants are charged. And the use of the term "cover up" is a plain and colloquial designation to differentiate between the initial acts—which resulted in the fraud, conspiracy, and bribery

charges—and the subsequent alleged efforts to conceal those crimes. The Court finds unconvincing the suggestion that these captions, which occur with many other captions throughout the Indictment, are improperly emphasized by their having been capitalized or underlined or that they would tend to inflame the jurors. To the contrary, the Government's use of minimal but clearly identified language to demarcate sections and subsections of the Indictment makes the forty-page document more readable and tends to clarify the charges. For these reasons, the motion to strike language from the Indictment is denied.

## II. Motions for Bills of Particulars

■ Defendants seek particularization on the basis of the volume of documents made available to them by the Government, asserting a need to identify, *inter alia*, "means and methods" of the conspiracy not alleged in the Indictment, the substance of the materially false statements allegedly made by certain defendants, and disclosure of the names of unindicted co-conspirators.

■ The leading case on the issue in this Circuit is *United States v. Torres*, 901 F.2d 205 (2d Cir.1990), which concisely states the general principles to be applied:

> The function of a bill of particulars is to provide the defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial. A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused. Whether to grant a bill of particulars rests within the sound discretion of the district court. Acquisition of evidentiary detail is not the function of the bill of particulars. So long as the

defendant was adequately informed of the charges against him and was not unfairly surprised at trial as a consequence of the denial of the bill of particulars, the trial court has not abused its discretion.

*Id.* at 234 (internal quotations and citations omitted). "Furthermore, a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir.1999).

In light of *Torres*, bills of particulars are not routinely granted. Perhaps the most frequent case in which particulars are warranted is where discovery is overwhelmingly extensive *and* the government fails to designate which documents it intends to introduce and which documents are merely relevant to the defense. In *United States v. Upton*, 856 F.Supp. 727, 746–47 (E.D.N.Y.1994), for example, this Court granted particulars where the government failed in its discovery to "isolat[e] the documents that are relevant and may be offered at trial which would spare the defendants the task of examining all the documents." *Id.* at 747. *See also United States v. Nachamie*, 91 F.Supp.2d 565, 568 (S.D.N.Y.2000) (granting particulars where "[t]he problem ... is not a failure to produce, but a failure to designate."). Where such burdensome discovery exists, the defendant may be unfairly "buried with paper," *United States v. Turkish*, 458 F.Supp. 874, 882 (S.D.N.Y.1978), and unable to discern from the massive discovery production what part of his conduct was allegedly unlawful. This occurred in *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987). In *Bortnovsky*, the government introduced evidence relevant to twelve burglaries, alleging only four unspecified burglaries were fabricated, and thousands of documents, alleging that

three unspecified documents were false. *Id.* As a result, the defendants "were forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending" and the government effectively, but impermissibly, shifted the burden of proof. *Id.* at 575. The discernible principle, then, is that a large volume of discovery warrants a bill of particulars if it obfuscates the allegedly unlawful conduct and unfairly inhibits the defendant's preparation for trial.

The Indictment in this case specifies in Counts Two through Twenty One, and Twenty Three through Thirty Three, the date, volume, price, and source of the allegedly unlawful transactions at issue. And while precise quotes alleged to be false are not identified in the false statement counts, substantial descriptions of them are included. Moreover, in response to defendants' motion, the Government has turned over detailed information about the trades and the block orders that were related to those trades, as well as identified the documents that it intends to introduce as evidence of the Defendants' duties to their employers. Against this background, the Court finds no justification for ordering a bill of particulars, which would "confine[ ] the Government's proof to particulars furnished" and "restrict unduly the Government's ability to present its case." *United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y.1987), *aff'd* 875 F.2d 857 (2d Cir.1989). The Indictment fairly specifies the allegedly unlawful conduct, and the Government has not dissembled by means of its discovery.

As to the request for a list of unindicted co-conspirators, this Court has observed that "[t]he appellate case law is clear that the refusal of a district court to direct the filing of a bill of particulars as ·to the names of unindicted co-conspirators is not an abuse of discretion." *United States v. Gotti,* 784 F.Supp. 1017, 1018 (E.D.N.Y. 1992) (citing *Torres,* 901 F.2d at 233–34.) *See also United States v. Coffey,* 361 F.Supp.2d 102, 122 (E.D.N.Y.2005) ("Courts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators or others allegedly involved.") (citing *United States v. Rodriguez,* 1999 WL 820558 at *2 (S.D.N.Y.1999) (denying motion for a bill of particulars identifying known co-conspirators where the indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial."); *United States v. Glisson,* 2003 WL 21709502 at *3 (S.D.N.Y.2003) ("denying bill of particulars seeking names of all co-conspirators and aiders and/or abettors in light of routine denial of such requests in case law and the sufficiency of information contained in the indictment and obtained through discovery.")). As in *Gotti,* Defendants here have cited a contrary line of district court cases requiring disclosure of co-conspirators, but no appellate authority requiring such disclosure. Thus, this Court reaches the same conclusion it reached in *Gotti* that "[t]he better authority … mandates that the question of granting the request of these defendants for a bill of particulars on this point is entirely a matter of the sound discretion of the court." *Gotti,* 784 F.Supp. at 1019. Considering the specificity of the allegations in the Indictment and the discovery that the Government has provided, it is the estimation of this Court that Defendants have received adequate information on which to prepare their defenses. The request for particulars naming the unindicted co-conspirators is denied.

### III. Motions for Severance

 Rule 14(a) of the Federal Rules of Criminal Procedure provides, in rele-

vant part, that "If the joinder of offenses or defendants in an indictment ... appears to prejudice a defendant ... the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." While the decision of whether or not to grant severance is "committed to the sound discretion of the trial judge," *United States v. Spinelli*, 352 F.3d 48, 53 (2d Cir.2003), courts strongly prefer joinder, severing "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). "Joint trials are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy." *Spinelli*, 352 F.3d at 55.

Ghysels, Mahaffy, Malin, Nwaigwe, and Picone all argue that they will be adversely affected by two forms of "spillover prejudice" resulting from being tried alongside the other defendants: First, they contend that because some, but not others, of the defendants have been charged with making false statements and witness tampering in addition to the conspiracy and securities fraud offenses, the defendants not alleged to have made false statements or tampered with witnesses will suffer from spillover prejudice when jurors inevitably conflate the testimony on the false statement and witness tampering charges with the testimony on the conspiracy and securities fraud offenses. Next, the defendants also argue that the varying amounts of evidence against each of the defendants will cause juror confusion.

 Spillover prejudice "occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir.1998) (internal citations omitted). Because the Defendants in this case have all been charged with the same conspiracy to commit securities fraud, the risk of spillover prejudice is presumptively low. *See Id.* (noting that spillover prejudice is an "unlikely occurrence when all the defendants are charged under the same conspiracy count."). Evidence of the other alleged conspirators' acts would almost always be admissible against each of the defendants to prove the existence of the conspiracy. *See, e.g., United States v. DiNome*, 954 F.2d 839, 843 (2d Cir.1992) (evidence of acts committed by others in the RICO conspiracy relevant to the RICO charges against a defendant). Moreover the Defendants' specific arguments that prejudice is likely, based on the fact that some of them have been charged with more or different offenses than others and the asserted likelihood that jurors will be confused or unable to limit their consideration of the evidence of offenses to only those individuals alleged to have committed them, are roundly rejected in precedent. "[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *Spinelli*, 352 F.3d at 55 (citing *United States v. Carson*, 702 F.2d 351, 366–67 (2d Cir.1983)). And jurors are presumed to be able to follow a limiting instruction from the court that the evidence should be considered against each individual defendant, not against the defendants collectively. "Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions." *United States v. Downing*, 297 F.3d 52, 60 (2d Cir.2002) (citing *Zafiro* 506 U.S. at 540–41, 113 S.Ct. 933 (emphasizing that prejudice "can be cured with proper instructions, and juries are presumed to

follow their instructions") (internal quotation marks omitted)). Upon Defendants' request, the Court will properly instruct the jury as to the proper basis for the introduction of evidence. The Court finds no reason, however, to conclude that the limited risk of spillover prejudice cannot be cured by more conservative remedial measures other than severance.

■■■■■ Nwaigwe, Mahaffy, and Picone also argue for severance on the basis that statements given to the SEC by their co-defendants refer to them by name. Citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and its progeny, they contend that the inability to cross-examine their co-defendants, who will presumably be unavailable witnesses, violates their rights under the Confrontation Clause. In response, the Government proffers that it "does not intend to introduce any statements by a defendant that name or make reference to a co-defendant. Where necessary, the government intends to make appropriate redactions to any such statements ..." (*Response Memorandum*, at 60). Accepting the Government's proffer, the Court presently finds no basis for severing the Defendants based upon the statements to the SEC in which they are named. Should the Government seek to introduce statements that may run afoul of *Bruton*, the Court may reconsider this motion. Defendants should be well-aware, however, that "when a confession is redacted so that it does not facially incriminate the defendant, its admission with a proper limiting instruction does not violate the Confrontation Clause." *United States v. Lung Fong Chen*, 393 F.3d 139, 148 (2d Cir.2004) (citing *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)).

■■■ Mahaffy and O'Connell have moved for O'Connell's severance, arguing that they have antagonistic defenses with respect to the false statement charge against Mahaffy and the witness tampering charges against O'Connell. To discern whether their defenses are truly antagonistic, "to the point of being so irreconcilable as to be mutually exclusive," some analysis of the charges is helpful. *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir.1991).

Counts Thirty–Seven and Thirty–Eight of the Indictment charge Mahaffy with making false statements to the SEC. Specifically, Count Thirty–Seven charges that he "falsely stated that he only placed an open telephone line in close proximity to Merrill Lynch's Squawk Box for short periods of time for the purpose of allowing his clients to listen to Merrill Lynch analysts," (Indictment, ¶ 53), and Count Thirty–Eight charges that he "falsely stated that he believed it would be difficult for certain clients who had access to an open telephone line in his Citigroup office to listen to his Citigroup Squawk Box because he typically kept the line muted for lengthy portions of the trading day." (Indictment, ¶ 55).

In Counts Thirty Four and Thirty Five, O'Connell is charged with conspiracy to tamper with a witness and witness tampering. Count Thirty Four charges that he conspired "to corruptly persuade and engage in misleading conduct toward Jane Doe," with the intent of influencing her testimony in an official proceeding, inducing her to withhold testimony, and impeding her communications with law enforcement officials. (Indictment, ¶ 47). Count Thirty Five charges the related substantive offense.

Mahaffy intends to defend against the false statements charges by denying the falsity of the contested statements. As part of his defense, he would purportedly testify that he urged the Government to conduct an interview of his and O'Connell's

trading assistant, Jane Doe, and that he refused O'Connell's efforts to deceive investigators. While it is unclear on what basis this testimony would be relevant to Mahaffy's defense, assuming its admissibility, Mahaffy and O'Connell contend that if the jury believes Mahaffy's testimony, it is virtually assured that O'Connell will be convicted of Counts Thirty Four and Thirty Five of the Indictment.

While Mahaffy's testimony would, if heard and credited by the jury, likely be damaging to O'Connell's defense against witness tampering, "[a] trial need not be severed simply because codefendants raise conflicting defenses." *United States v. Blount* 291 F.3d 201, 209 (2d Cir.2002) (citing *Zafiro*, 506 U.S. at 538–39, 113 S.Ct. 933). Mahaffy and O'Connell's defenses may conflict, but they are not antagonistic because it would not be necessary for the jury to convict O'Connell of witness tampering in order to acquit Mahaffy of the false statement charges. *See Cardascia*, 951 F.2d at 484 (defenses are antagonistic where, "in order to accept the defense of one defendant, the jury must of necessity convict a second defendant."). The false statement charges against Mahaffy require the jury to assess his actions and state of mind in placing the telephone receiver near the squawk box and to determine whether he accurately reflected those actions and intentions in his subsequent testimony to the SEC. The core of Mahaffy's defense, then, will be to contest the Government's evidence of his intent when the receiver was placed near the squawk box, the manner in which it was done, and Mahaffy's belief about the clients' use of that information. None of this implicates the separate allegation that O'Connell attempted to deceive the investigators or tampered with witnesses. Because "[s]everance on the ground of inconsistent defenses is required only when the jury, in order to believe the *core* testimony offered on behalf of one defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant," *United States v. Rea*, 958 F.2d 1206, 1225 (2d Cir.1992) (emphasis added), such a remedy is not required here.[1]

## IV. Motions to Suppress

Picone and O'Connell have filed motions to suppress statements; Picone moves to suppress statements he made to the SEC, and dismiss Count Forty One for making false statements in a government investigation, while O'Connell moves to suppress recorded statements made by a Government informant, Jane Doe.

### A. Picone's suppression motion

It is well-established that as a general rule, "[t]he prosecution may use evidence acquired in a civil action in a subsequent criminal proceeding unless the defendant demonstrates that such use would violate his constitutional rights or depart from the proper administration of criminal justice." *United States v. Teyibo*, 877 F.Supp. 846, 855 (S.D.N.Y.1995) (citing *United States v. Unruh*, 855 F.2d 1363, 1374 (9th Cir.1987)) (citing *United States v. Kordel*, 397 U.S. 1, 12–13, 90 S.Ct. 763, 769–70, 25 L.Ed.2d 1 (1970)) ("Kordel"),

---

1. This case is distinguished from cases like *United States v. Serpoosh*, 919 F.2d 835 (2d Cir.1990), in which severance was required because the two co-defendants "gave detailed and mutually exclusive explanations of their conduct on the day of the arrest." *Id.* at 838. There, in order to credit either of the defendants' responses to the evidence submitted by the government, the jury must necessarily have found the other defendant to be guilty. Such is not the case here, where there is no necessary interdependence between Mahaffy's explanation of his use of the telephone with the squawk box and O'Connell's alleged efforts to tamper with witnesses.

cert. denied sub nom. *Forde v. United States*, 488 U.S. 974, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988). In dicta, *Kordel* hypothesizes that there may be instances in which the Government's conduct "reflect[s] such unfairness and want of consideration for justice" as to warrant the court's reversal of a conviction or a dismissal of an indictment. *Kordel* at 11, 90 S.Ct. 763. *See also United States v. Parrott*, 248 F.Supp. 196 (D.D.C.1965) (noting that "the Supreme Court has made it clear that Federal courts do have supervisory authority . . . over the manner in which Federal agents exercise their powers.") (citing *Rea v. United States*, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956)). For example, *Kordel* suggests that "where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution," such a departure has occurred. *Id.* at 12, 90 S.Ct. 763.

Picone acknowledges that there is "concededly sparse precedent where such violations have been found." (*Picone Mem. in Supp. of Mot. to Dismiss*, "Picone Mem.," at 7). Nonetheless, analogizing to *United States v. Stringer*, 408 F.Supp.2d 1083 (D.Ore.2006) and *United States v. Scrushy*, 366 F.Supp.2d 1134 (N.D.Ala. 2005), he moves to suppress statements he made to the SEC and to dismiss Count Forty–One, which charges him with making false statements to a government investigator. Picone asserts that the methods employed by the government to obtain his testimony before the SEC, and the failure of the government to promptly advise his counsel of a potential conflict of interest in his representation, violated his constitutional rights under the Fifth and Sixth Amendments to the United States Constitution.

In *Stringer*, the defendants were subjected to a securities fraud investigation by the SEC, lasting more than two years, which was orchestrated by the United States Attorney's Office ["USAO"] as a means of "conceal[ing] the criminal investigation from [the] defendants." *Stringer*, 408 F.Supp.2d at 1088. Evidence showed that several years prior to the criminal indictment, the Assistant United States Attorney and the SEC investigators had "extensive discussions" about the case, and, rather than initiating parallel proceedings, used the SEC investigation in order to "suppress the presence of the USAO." This, despite the fact that a decision had already been made that the case warranted prosecution. *Id.* 1085, 1086. Moreover, when the defendant testified before the SEC, his attorney asked if the SEC was "working in conjunction with any other department of the United States, such as the United States Attorney's Office," and received a response that was "evasive and misleading, particularly in light of the close association between the USAO and the SEC throughout the investigation and the early identification of Stringer as a criminal target." *Id.* at 1088, 1089. Against this background, the *Stringer* court found that the USAO had "spent years hiding behind the civil investigation to obtain evidence, avoid criminal discovery rules, and avoid constitutional protections," actions "so grossly shocking and so outrageous as to violate the universal sense of justice." *Id.* (citing *United States v. Smith*, 924 F.2d 889, 897 (9th Cir.1991)).

*Scrushy* stands for the principle, similar to *Stringer*, that a court may find the government has departed from the proper administration of criminal justice where it "manipulate[s] the simultaneous [criminal and civil] investigations for its own purposes." *Scrushy*, 366 F.Supp.2d 1134, 1140. In *Scrushy*, the USAO in Birming-

ham contacted SEC investigators in Atlanta with the information that it had identified witnesses to "a massive fraud [that] had been occurring at HealthSouth since its inception ... and that Mr. Scrushy allegedly knew of the fraud." *Id.* at 1136. Though the SEC had already been prepared to depose Mr. Scrushy in Atlanta on this matter, as a result of the involvement of the prosecutors, they determined to move the deposition to Birmingham, to secure jurisdiction for criminal prosecution, and to adjust their deposition strategy so as to support the criminal investigation. The court found that the SEC investigator:

> received explicit directions from the U.S. Attorney's office concerning tailoring his examination of Mr. Scrushy. He was told areas to avoid to keep Mr. Scrushy in the dark regarding the criminal investigation, and [he] specifically included questions in the examination that he would not have included had the U.S. Attorney's office not contacted the S.E.C. and discussed the criminal investigation.

*Id.* at 1138. Against this background, the Court found that "the S.E.C. civil investigation merged with the Justice Department criminal investigation," and granted suppression of the evidence on the grounds that the failure to advise Scrushy of that merger constituted a departure from the proper administration of justice. *Id.* at 1139.

Two other cases cited by Picone, *United States v. Tweel*, 550 F.2d 297 (5th Cir.1977) and *United States v. Parrott*, 248 F.Supp. 196, 202 (1965), support the principles more directly elaborated upon in *Stringer* and *Scrushy*. In *Tweel*, the defendant was subject to an IRS audit that had been specifically requested by the Organized Crime and Racketeering Section of the Department of Justice. Observing that the IRS investigator had failed to respond with the complete truth to the defendant's inquiry whether or not a special agent was involved in the audit, and thus whether or not it had criminal implications, the court observed that:

> the mere failure of a revenue agent ... to warn the taxpayer that the investigation may result in criminal charges, absent any acts by the agent which materially misrepresent the nature of the inquiry, do not constitute fraud, deceit and trickery ... [but] the agent's failure to apprise the appellant of the obvious criminal nature of this investigation was a sneaky deliberate deception by the agent ... and a flagrant disregard for appellant's rights.

*Tweel*, 550 F.2d at 299. *Parrott*, similarly concerned with the impropriety of using a civil proceeding strictly for the purpose of developing evidence for a subsequent criminal prosecution, is distinguished in that it ultimately dismissed the indictment for failure to afford the defendants a speedy trial. *Parrott* 248 F.Supp. at 202. *United States v. Thayer*, 214 F.Supp. 929 (D.Colo. 1963), also cited by Picone, while in the same vein as the others, is distinguishable on its facts. In that case, the defendant gave statements to the S.E.C. that the agency suspected were perjured. He was subsequently called in to "clarify" his statements, and a perjury charge followed. In that case, the Court suspected, based on the investigators' testimony, that the purpose of the second interview was not to enlighten the substantive investigation, but "with a view to obtaining clearcut perjured testimony which would be suitable for an indictment." *Id.* at 932. The court held that in those circumstances, full disclosure of the imminent perjury charge would have been required. Here, however, there is no suggestion that the S.E.C. specifically sought to ensnare Picone in a perjury charge by initially, or repeatedly, inter-

viewing him; rather, Picone had been identified from an early date as a person that the S.E.C. sought to interview in the substantive investigation. (*See Gov't Mem. in Opp.*, Ex. H "Murphy Aff.", ¶ 3). That Picone is alleged to have testified falsely does not, in itself, put this case on the same footing as *Thayer*.

The facts in this case do not support a finding by this Court that the Government has engaged in any such egregious conduct as to constitute a violation of the universal sense of justice. The statement of Robert H. Murphy, Branch Chief in the Division of Enforcement in the New York Regional Office of the S.E.C., belies a conclusion that the investigations were intertwined. In relevant part, he stated that at his direction, a testimonial subpoena was issued to Mr. Picone on July 26, 2005. Murphy swears that "[he] made the decision to seek Mr. Picone's testimony without any suggestion by the USAO that the Commission staff do so," that he and other S.E.C. personnel "did not receive any suggestions from the USAO as to [their] questions" for Picone, and that "[a]t no time prior to Mr. Picone's testimony did the USAO inform the Commission staff that Mr. Picone was a subject or target of that office's criminal investigation." (*Id.*, ¶¶ 6–9). Only months later, on January 31, 2006, did the USAO inform the S.E.C. that it might decide to bring criminal charges against Picone. This was, to the best of Murphy's knowledge, "the first occasion on which the USAO indicated to the Commission staff that the USAO was likely to charge Mr. Picone criminally." (*Id.*, ¶ 10).

Moreover, Picone's own attorney, Jerry Bernstein, acknowledges that he was aware that the S.E.C. and the USAO were conducting parallel investigations into the Watley matter. (*See* Picone Mem. in Supp., Ex. B ("Bernstein Aff.")). He states that his firm was "retained by A.B. Watley Group, Inc" ("A.B.Watley") to represent A.B. Watley in connection with *investigations* being conducted by the Securities and Exchange Commission ("SEC") and the United States Attorneys' Office for the Eastern District of New York ("USAO EDNY"). (*Id.*, ¶ 2 (emphasis of the plural added)). This case is clearly distinguished from both *Stringer* and *Scrushy* in that the defendant, and his attorney, were well-aware of the USAO's investigation prior to appearing for questioning in the civil investigation. There are no facts to suggest that the USAO hid behind or manipulated the S.E.C. with the intention of misrepresenting its true intentions to the defendants. Rather, the only inference from the record is that the USAO was open with respect to the existence of a criminal investigation surrounding the events at A.B. Watley, and that Picone and his attorneys were aware that the statements he made under oath in the S.E.C. interview might be passed along to the USAO to assist them in their parallel investigation.

In the alternative, Picone argues that the USAO and the S.E.C. failed to advise him, prior to his interview with the S.E.C., that he had become a target of the criminal investigation and that his counsel might have been conflicted. There are no facts to substantiate Picone's conclusion that he had become a target of the criminal investigation prior to the S.E.C. interview. While Picone had been informed as early as September 2004 that he was an individual from whom the S.E.C. was interested in obtaining information, (*See* Murphy Aff., ¶ 3), his speculation that he had become a target of the criminal investigation by the time he was interviewed is wholly speculative, and in some conflict with the fact that Picone was not charged in August 2005, when this case was first indicted, but first advised in December 2005 that he had become a target and should obtain independent counsel. The

conclusion that Picone did not become a target of the criminal investigation until months later is also supported by Murphy's statement that the USAO did not inform the S.E.C. of its intent to indict Picone until January 2006. The only inference available from the facts is that subsequent to the August 2005 indictment, the USAO reviewed Picone's July 2005 testimony to the S.E.C., and in light of developments in their investigation, identified Picone as a target.[2]

■■■■ Finally, Picone seeks an evidentiary hearing to allow inquiry into these issues. An evidentiary hearing is only required "if 'the moving papers are sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that contested issues of fact ... are in question.'" *United States v. Watson*, 404 F.3d 163, 167 (2d Cir.2005) (citing *United States v. Pena*, 961 F.2d 333, 339 (2d Cir.1992)). In *Stringer*, *Scrushy* and *Thayer*, for example, the Court's inquiry into the Government's investigation was occasioned by some threshold evidentiary showing giving rise to a reasonable concern about intertwinement. *See, e.g., Stringer*, 408 F.Supp.2d at 1087 (quoting misleading statements by S.E.C. investigator about the existence of the criminal investigation); *Scrushy*, 366 F.Supp.2d at 1135 ("[t]he Defendant filed this motion as a direct result of the trial testimony of Neil Seiden, Senior Accountant with the

S.E.C." that the USAO had decided the location of Scrushy's deposition); *Thayer*, 214 F.Supp. at 931 (summarizing testimony of S.E.C. investigator at trial). Picone has failed to produce evidence that leads the court to question whether the investigation was improperly conducted. His conclusory assertions that the government misrepresented his status at the time of his interview, misled him into making false statements, and that the S.E.C. operated as a surrogate for the USAO, without more, do not warrant an evidentiary hearing.

**B. O'Connell's suppression motion**

■■■ O'Connell moves for the suppression of recorded statements that implicate him in the witness tampering charges. The essence of his motion is that the statements were recorded by Jane Doe at the behest of the government, without his knowledge, at a time when the government knew that he was represented by counsel. This, according to O'Connell, violated American Bar Association Disciplinary Rule ("DR") 7–104(A)(1), incorporated as part of 1200.35 of the Disciplinary rules of the Code of Professional Responsibility of the State of New York,[3] and should result in suppression of the statements.

In support of his motion, O'Connell relies upon *United States v. Hammad*, 858 F.2d 834 (2d Cir.1988), in which the Court of Appeals affirmed this Court's suppres-

---

**2.** Moreover, even if the government violated its duty to advise of a conflict, springing from the rules of professional conduct, *see United States v. Turkish*, 470 F.Supp. 903, 906–911 (S.D.N.Y.1978), suppression of the statements or dismissal of the indictment would not be required, but would fall within the supervisory power of the court. *Cf. United States v. Hammad*, 858 F.2d 834, 837, 841 (2d Cir. 1988)(courts enforce professional responsibility standards under general supervisory authority over members of the bar; suppression may be ordered as a remedy for violation of

professional standards in the district court's discretion).

**3.** That rule states that "during the course of the representation of a client a lawyer shall not: communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so." 22 N.Y. ADC 1200.35(a)(1).

sion of statements obtained from a represented defendant without notice to his counsel. *See also United States v. Hammad,* 678 F.Supp. 397 (E.D.N.Y.1987). In that case, Hammad was charged with Medicaid fraud. In a ruse to obtain inculpatory statements from Hammad, the prosecutor supplied a witness with a sham grand jury subpoena and arranged to record his conversation with the defendant without informing Hammad's counsel. This Court found that the witness acted as an alter ego of the prosecutor, that Hammad was represented by counsel at the time of the ruse, and that the statements thus obtained were in violation of DR 7–104(A)(1). Exercising its supervisory power, and limiting its holding "to instances in which a suspect has retained counsel specifically for representation in conjunction with the criminal matter in which he is held suspect, and the government has knowledge of that fact," 678 F.Supp. at 401, this Court held the recorded statements inadmissible.

Affirming this Court's holding that a violation of DR 7–104(A)(1) in the investigatory stage of a criminal proceeding could result in suppression, and committing the decision whether or not to suppress to the discretion of the district court, the Court of Appeals nonetheless "urge[d] restraint in applying the rule to criminal investigations to avoid handcuffing law enforcement officers in their efforts to develop evidence." *Id.* at 838. The ruling in *Hammad* was certainly not intended to proscribe undercover investigations, nor necessarily even to truncate or prohibit the continued undercover investigation of individuals who were represented by counsel though not yet indicted. As the Court of Appeals held, "the use of informants by government prosecutors in a pre-indictment, non-custodial situation, *absent the type of misconduct that occurred in this case,* will generally fall within the "author-ized by law" exception to DR 7–104(A)(1) and therefore will not be subject to sanctions." *Hammad,* 858 F.2d at 840 (emphasis added). The "type of misconduct" that warranted suppression in the eyes of this Court and the Court of Appeals, was the employment of the fraudulent grand jury subpoena by the prosecutor. *Cf. Id.* (the "use of the [sham grand jury subpoena] contributed to the informant's becoming that alter ego of the prosecutor."). Absent that additional misconduct, this Court may have ruled differently in *Hammad.*

In this respect, the exercise of the Court's supervisory power to suppress a statement based on a violation of DR 7–104(A)(1) is similar to the exercise of the Court's supervisory power to suppress statements or dismiss an indictment as discussed in *Stringer, Scrushy,* and *Teyibo, supra.* The Court looks to whether the violation of DR 7–104(A)(1) either deprived the defendant of his constitutional rights or departed from the proper administration of criminal justice. In *Hammad,* the Court essentially found that the violation of DR 7–104(A)(1), in the context of the additional use of the sham subpoena, departed from the proper administration of justice. The Court finds no such departure here. At the time that the recordings were made, O'Connell was admittedly represented by counsel with respect to the securities fraud allegations; but whether the scope of that representation extended to the undisclosed suspicion of witness tampering is not only doubtful, but ultimately immaterial. The suspicion that O'Connell might have committed the separate offense of witness tampering could only be confirmed by the employment of legitimate enforcement investigatory techniques, not excluding the use of an undercover informant. Asking the witness whom O'Connell had reportedly made ef-

forts to intimidate to wear a wire and record offensive statements might not have violated DR 7–104(A)(1), because the witness tampering was a separate matter from the securities fraud investigation. But even if it did violate DR 7–104(A)(1), this Court would not find that, in the circumstances of this case, such investigation departed from the proper administration of criminal justice or warranted suppression. As a final note, this ruling rings consonantly with the recently decided *Hudson v. Michigan*, —— U.S. ——, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), which implies that suppression based on constitutional violations might not be warranted where the remedy is incongruent with the harm. Though the basis of the proposed suppression here is a violation of disciplinary rules, not the constitution, were a violation of the disciplinary rules established, the Court might engage in a similar analysis as the *Hudson* Court to determine that suppression would not be the proper remedy.

## V. Pre–Trial Disclosures

### A. Nwaigwe's motion to compel disclosure

During the latter stages of the Government's investigation, Nwaigwe waived attorney-client privilege and allowed the Government to interview the attorneys who had prepared him for his appearance before the SEC. One of the attorneys also testified before the grand jury.

Nwaigwe offers two theories to support the disclosure of notes taken by the government during meetings with these attorneys: First, Nwaigwe contends that his attorneys met with the Government as his agents and, thus, "the notes of those meetings stand in the same stance, as the notes of the government's meetings with Nwaigwe." Because statements made by the defendant are subject to disclosure under Rule 16(a)(1)(A), he concludes that any notes of the governments interviews with his attorneys fall within the purview of Rule 16. Second, Nwaigwe finds authority for disclosure based on Rule 16(a)(1)(C), which provides as follows:

> Organizational Defendant. Upon a defendant's request, if the defendant is an organization, the government must disclose to the defendant any statement described in Rule 16(a)(1)(A) and (B) if the government contends that the person making the statement:
>
> (I) was legally able to bind the defendant regarding the subject of the statement because of that person's position as the defendant's director, officer, employee, or agent; or
>
> (ii) was personally involved in the alleged conduct constituting the offense and was legally able to bind the defendant regarding that conduct because of that person's position as the defendant's director, officer, employee, or agent.

Nwaigwe's argument that his attorneys' statements are discoverable under Rule 16(a)(1)(A) essentially rests upon a theory of "vicarious utterance" that has been rejected by the Second Circuit. In *United States v. Percevault*, 490 F.2d 126 (2d Cir. 1974), the defendant was charged in a multiple defendant securities law conspiracy and moved for disclosure of co-conspirator statements. Noting the "need for the vicarious utterances of the defendant . . . to be revealed since in many cases he will be unaware of the many statements allegedly made by his fellow conspirators. His counsel should be apprised of them, for often they will be quite damaging unless explained," the district judge ordered discovery of

> "any relevant written or recorded statement or confession made by a co-con-

spirator after the conspiracy terminated, including grand jury testimony, reporting a statement that the government intends to introduce against the defendant Percevault *as his admission* because it was made by a co-conspirator in the course of and in furtherance of the conspiracy charged."

*Id.* at 130, 128 (emphasis added). In reversing the district court, the Court of Appeals observed that: "[i]n effect, Judge Weinstein employed the vicarious admissions exception to the hearsay rule as a device for transposing the justifications for disclosing a defendant's statements to statements made by non-defendants." *Id.* at 130. Without belaboring the opinion in *Percevault,* it is sufficient to note that the Court of Appeals disapproved of the judge's "expan[sion of] the scope of 16(a) to include statements made by persons who are not defendants," and held that "Rule 16(a) simply does not encompass these statements." *Id.* at 130, 131.

While *Percevault* was decided against the defendant's discovery motion for vicarious utterances of his co-conspirators, its principle applies in this case. Vicarious utterances are not subject to disclosure under Rule 16(a)(1)(A). Thus, Nwaigwe's application to this Court to recognize his attorneys' statements to the Government or to the grand jury as vicarious utterances, and treat them accordingly as if they were his own statements subject to disclosure under Rule 16(a)(1)(A), relies upon an erroneous interpretation of the rule and must be denied. Similarly, his invocation of Rule 16(a)(1)(C), the "Organizational Defendant" subsection, stretches the discovery rule beyond its breaking point. Rule 16(a)(1)(C), by its plain terms, only applies when the defendant is an organization *and* the Government contends that the person was legally able to bind the organization by means of his statement or conduct. Neither requirement has been

fulfilled here. Nwaigwe's motion for Rule 16 discovery of his attorneys' statements must be denied.

**B. Defendants motions for other pretrial disclosures**

Defendants have also moved for immediate disclosure of *Giglio* and *Brady* material, and sought a schedule for other pretrial disclosures. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Government has represented that it has already disclosed certain exculpatory evidence, and is aware of and will continue to comply with its obligations. *See United States v. Coppa,* 267 F.3d 132, 144 (2d Cir.2001). Moreover, in Response, the Government proposed a discovery schedule, which has not been objected to by any of the defendants. Thus, the motion is denied.

SO ORDERED.