**UNITED STATES of America**

v.

**Luis Posada CARRILES.**

**No. EP–07–CR–00087–KC.**

United States District Court,
W.D. Texas,
El Paso Division.

May 8, 2007.

See, also, 481 F.Supp.2d 792.

David B. Deitch, John Williams Van-Lonkhuyzen, Paul Edward Ahern, U.S. Department of Justice, Washington, DC, Joseph H. Gay, Jr., Assistant U.S. Attorney, San Antonio, TX, Margaret Feuille Leachman, United States Attorney's Office, El Paso, TX, for United States of America.

Rhonda Anne Anderson, Rhonda A. Anderson, P.A., Coral Gables, FL, Arturo

V. Hernandez, Arturo V. Hernandez, P.A., Miami, FL, Felipe D. J. Millan, El Paso, TX for Luis Posada Carriles.

## ORDER

CARDONE, District Judge.

On this day, the Court considered "Defendant Luis Posada Carriles' Motion to Exclude Transcripts and Tapes of Naturalization Interviews" ("Motion to Exclude Tapes and Transcripts") and "Defendant Luis Posada Carriles' Motion to Suppress Evidence and Statements" ("Motion to Suppress Evidence"). For the reasons set forth herein, Defendant's Motion to Exclude Tapes and Transcripts is **GRANTED** and Defendant's Motion to Suppress Evidence is **GRANTED.** Furthermore, the indictment is hereby **DISMISSED.**

## I. BACKGROUND

Defendant Luis Posada Carriles ("Defendant") is a seventy-nine (79) year old Cuban national who has spent his life opposing Fidel Castro. Between 1960 and 1964, he served in the United States Army and later became involved with the Central Intelligence Agency. In March of 2005, Defendant entered the United States seeking asylum, and later filed an application for naturalization. He was scheduled to attend an interview with the Department of Homeland Security ("DHS") Citizenship and Immigration Services ("USCIS") on May 17, 2005, but cancelled the interview, withdrew his application for asylum, and held a press conference instead. Later that day, DHS Immigration and Customs Enforcement ("ICE") took him into custody.

On January 11, 2007, a federal grand jury returned a seven count indictment against Defendant. The indictment charges him with one count of violating 18 U.S.C. § 1425(a) by making false state-

ments in the course of his application for United States citizenship. The indictment also charges Defendant with committing six separate violations of 18 U.S.C. § 1015(a) by making various false statements in connection with his attempted naturalization. In one of these six counts, the United States charges that he made a false statement by representing that he had used only the names "Luis Clemente Posada Carriles," "Ramon Medina," and "Franco Rodriguez" on various passports when, in fact, he obtained, possessed, and used a fraudulent passport issued by the Republic of Guatemala bearing his photograph and the name "Manuel Enrique Castillo Lopez."

It is Defendant's contention that as early as April 21, 2005, the Government through various agencies (including ICE and the Federal Bureau of Investigation ("FBI")) began an investigation into his history and manner of entry into the country. Unaware of this investigation, on October 11, 2005, Defendant filed an application for naturalization ("Form N–400") pursuant to section 329 of the Immigration and Naturalization Act ("section 329") based upon his honorable discharge from the United States military during a time of hostilities. While this application was pending, Defendant claims that the Government continued to investigate his alleged aliases, an alleged voyage on the vessel "Santrina," and documents pertaining to his alleged involvement in a 2000 plot to assassinate Fidel Castro. Moreover, in July of 2005, Defendant claims that an informant began cooperating with the FBI regarding allegations of Defendant's presence on the vessel Santrina in exchange for monetary rewards and assistance with his citizenship application. In sum, Defendant alleges that by the time he was scheduled for a naturalization interview in April of 2006, federal agents had

already assembled a significant dossier against him.

The Government argues that prior to Defendant's interview of April 2006, federal agents executed a search warrant during the course of an unrelated investigation and discovered a passport in the name of "Manuel Enrique Castillo Lopez," bearing Defendant's picture and stamps indicating entry into Mexico in the state of Quitana Roo.

On May 4, 2007, this Court conducted an evidentiary hearing regarding both of Defendant's Motions. During that hearing, the Court heard oral argument and received testimony from two witnesses: Susana Bolanos and Carlos Spector.

Susana Bolanos ("Bolanos") is an adjudications officers with USCIS. Her duty station is in Washington, D.C. and she specializes in cases involving fraud and national security. She conducted Defendant's naturalization interview on April 26 and 27, 2006 at the El Paso Service Processing Center. Present with her at this interview were Defendant and his two attorneys, Felipe Millan ("Millan") and Maria Trina Burgos, a DHS attorney named Jo Ellen Ardinger ("Ardinger"), an attorney with the Department of Justice ("DOJ") Office of Immigration Litigation named Nick Perry ("Perry"), a Spanish interpreter named Luis Granados ("Granados"), and a "special response team" videotaping the interview.

During the May 4, 2007 hearing, Bolanos testified that she had conducted only three to four interviews within the last year. All of them were videotaped, yet the interview at issue is the only one in which the tape is unavailable because of alleged equipment malfunction. In addition, Bolanos admitted that it was unusual for her to be brought in to handle this interview; that it was an earmark of irregularity.

Bolanos first received Defendant's Alien File ("A–File") approximately five to six months before his scheduled interview. Upon receipt of the file, she conducted her own research via newspaper articles, books, and internet. When she first reviewed Defendant's application, she determined that he was probably not eligible for naturalization due to his prior conviction for public endangerment in Panama, but scheduled an interview with him nonetheless. She testified that it was standard practice to grant everyone a naturalization interview, that he was entitled to the interview, and that she had never denied anyone citizenship without an interview.

While preparing for the interview, she testified that she met with Ardinger, Perry, and another unnamed DOJ attorney. This meeting took place between two and four weeks before Defendant's scheduled naturalization interview. The purpose of this meeting was to discuss the "flow" of questioning, as both Ardinger and Bolanos were set to question Defendant. By "flow," Bolanos testified that she meant that everyone wanted to make sure that they were all understanding the questions and that there would be continuity between Ardinger and Bolanos during the questioning. She testified that everyone reviewed all of the questions.

She denied the suggestion that anyone present at this meeting urged her to ask any question in particular. She stated that she asked about the Havana bombings, the Guatemalan passport, and Defendant's means of entry because they were just "part of the review," based upon the newspaper articles, A–File, and classified materials she had reviewed to prepare for the interview. She testified that someone must have made her aware of the Guatemalan passport, but that she could not recall who that might be. She also admitted that illegal entry charges are im-

migration issues, not criminal issues, but that possession of a fraudulent Guatemalan passport is a criminal offense.

She acknowledged that she does not meet with the DOJ in every case, and that she is aware that the DOJ is the prosecutorial arm of the executive branch of government. She also acknowledged that she was aware that Ardinger was a DHS attorney and more likely than not handled criminal cases. Nevertheless, she denied any awareness of two separate investigations. When asked what she thought of the fact that so many Government attorneys attended a pre-interview meeting and the actual interview, Bolanos responded that she thought it was a significant case for everyone based on Defendant's background.

She testified that the purpose of a naturalization interview is to determine whether an applicant meets the eligibility requirements for the particular section of the statute under which they are seeking naturalization. She testified that the purpose of her questions during Defendant's interview was to verify information provided on the Form N–400, update it, and correct it. She asked questions about Defendant's former aliases to understand what documents were obtained in connection with them, in what context they were used, and how recently they were used. All this was done, she claims, in order to determine whether he had the requisite moral character for naturalization. She admitted, however, that this interview was atypical because there was more material for her to cover and it was more extensive.

Upon commencement of the interview, Bolanos read the following to Defendant:

> This proceeding is being audio-visually recorded to ensure that a complete record is made.
>
> Today's date is APRIL 26, 2006. The time is ———.
>
> This is the United States Department of Homeland Security, Citizenship and Immigration Service. El Paso District Office. I am Adjudications Officer Susana Bolanos, with me to assist with this interview are Jo Ellen Ardinger and Nick Perry, DHS attorneys. A Spanish language interpreter, Luis Granados, is also present today to assist us in communicating when appropriate and necessary to ensure that I am able to obtain all the information required to fully adjudicate your application.
>
> The case file number is A12 419 708. We will be beginning the initial examination on the Application for Naturalization, Form N–400, filed by Mr [sic] Luis Clemente Posada Carriles on October 12, 2005 with this agency. This application was filed under Section 329 of the Immigration and Nationality Act as amended.
>
> We are conducting an administrative proceeding in reference to the aforementioned case to determine eligibility for the benefit sought.
>
> Also present at this interview is your attorney of record: Maria Trina Burgos. Understand that your attorney's role at this interview is to ensure that your legal rights are protected. Your attorney cannot respond to questions directed to you, or otherwise disrupt the interview. If your attorney disrupts the interview, I may choose to terminate the interview. If the interview is terminated for this reason, your application will be treated as if you failed to appear for the interview.
>
> Do you understand what I just said? Do you have any questions at this time?
>
> This proceeding shall be conducted under oath. All statements you make constitute sworn testimony. Any statements you make today can and may be

used for any purpose in any legal or administrative proceeding. If you don't know the answer to a question you are asked today, please don't guess but rather tell me you don't know the answer. If you don't understand any questions today, please stop me and tell me you don't understand so that the question can be repeated, rephrased, or clarified. If you feel a truthful answer to a question would tend to incriminate you, you can exercise your constitutional right against self-incrimination. If you lie or intentionally give misinformation, you may be subject to criminal or civil penalties or barred from immigration benefits, including naturalization. You are here voluntarily and you may choose to terminate this proceeding at any time.

To be sure you completely understand, I'm going to have the interpreter repeat what I just said to you in Spanish.

She testified that the following two statements are usually not provided during naturalization interviews, but that everyone present at the pre-interview meeting decided to insert them:

If the interview is terminated for this reason, your application will be treated as if you failed to appear for the interview.

If you feel a truthful answer to a question would tend to incriminate you, you can exercise your constitutional right against self-incrimination.

The interview lasted for approximately eight hours over the span of two days. She testified that she thought that, at the time of the interview, the A–File included a Form N–426 certifying Defendant's honorable discharge from the United States Armed Forces. She also testified that she did not fingerprint Defendant and could not answer as to whether someone else had.

She testified that she knew of Defendant's previous conviction for an aggravated felony in Panama, but when asked whether the naturalization interview was an exercise in futility because there was a legal basis to deny the application, she said that she could not answer yes or no. She further testified that at some point she became aware of a criminal investigation of Defendant but could not remember when that occurred.

In addition to Bolanos' testimony, the Court also received the testimony of Carlos Spector ("Spector"). Defense offered him, and the Government accepted him, as an expert witness for purposes of the hearing. He testified that an individual who has been honorably discharged from the military and who served during periods of hostility as defined by the executive branch is eligible for naturalization under section 329. In order to obtain such naturalization, he testified that it is necessary to submit a Form N–426 certifying prior service with an Application Form N–400 because USCIS will not act upon an application under section 329 until they have certification of prior service. An applicant will also need to establish good moral character for at least one year prior to filing an application for naturalization.

Spector testified that he has attended over 900 immigration interviews, and that in his experience, interviews are not granted in cases where the petitioner is clearly ineligible for naturalization. For example, he testified that in cases where someone has been convicted of an aggravated felony, they are statutorily barred from establishing good moral character and that the only reason such person would be invited to the processing center would be for the purpose of beginning removal proceedings. He described a conviction for an aggravated felony as the "kiss of death in immigration law." He also testified that he has

never had a client who was convicted of an aggravated felony but who received an executive pardon.

Spector testified that in his 900 interviews, not one had ever been video or audio-taped, involved two people asking questions, lasted two days, or involved a Government-provided interpreter. Rather, he testified that immigration interviews are usually conducted by one person, last a maximum of thirty minutes, and do not involve Government-supplied interpreters. Moreover, they usually do not involve the presence of DHS lawyers who also participate in the interview.

Spector testified that case law makes clear that illegal re-entry is not a crime of moral turpitude and does not effect one's moral character determination. Moreover, there is no section on the Form N–400 that deals with one's means of entry into the country. Put simply, the question of how someone entered the country is not relevant to the determination of his eligibility for naturalization.

When pressed about the requirement for a Form N–426 in connection with a naturalization interview, Spector admitted that there is no statute or regulation requiring the interviewer to have an N–426 "in their hand" at the interview. He noted though, that at interviews based on section 329 it is common practice for the adjudications officer to have the Form N–426 and provide the petitioner with a copy.

Though the absence of a Form N–426 certifying Defendant's former service in the United States Armed Forces was an issue contested during the May 4, 2007 hearing, the Government has since discovered and provided Defendant with a copy of his Form N–426, which was certified by fax on October 25, 2005.

The Court understands that there are two audio recordings of the April 2006 interview at issue in this case: an original cassette recording and an enhanced digital copy. With the aid of a court-certified interpreter, the Court has reviewed the digital copy multiple times.

## II. DISCUSSION

### A. Transcripts and Translation

Defendant moves to exclude the tapes and transcripts of Defendant's naturalization interview on the following grounds: (a) the poor quality and excessive inaudible portions of the tapes, (b) inaccurate transcription and translation of the tapes by an uncertified translator, and (c) inaccurate interpretation during the interviews conducted by an uncertified interpreter. Defendant argues that these deficiencies are so egregious, in light of the fact that they form the basis for the indictment, as to render the tapes and transcripts unreliable and inadmissible.

The Government responds by arguing that although portions of the original tape may be inaudible, the enhanced digital copy is mostly audible and thus the inaudible portions do not render the tape or digital copy untrustworthy. The Government further argues that if the Defendant takes issue with the Government's transcript, then Fifth Circuit precedent dictates that the solution is for the Defendant to provide his own version of the transcript and for the judge to submit both to the jury. Finally, the Government argues that the interpreter used in the hearing is qualified, and that Defendant had a Spanish-speaking lawyer present who presumably could have and would have objected to interpretations he deemed inadequate.

### 1. Poor Quality of the Tapes

■ The Fifth Circuit has not adopted a formulistic standard regarding the admissibility of tapes and transcripts. *United States v. Greenfield,* 574 F.2d 305, 307 (5th

Cir.1978). When a tape recording is challenged as being partially inaudible, there is no *per se* rule mandating exclusion. *Id.* Rather, tapes which contain inaudible portions are admissible unless the inaudible portions are " 'so substantial as to render the recording as a whole untrustworthy.' " *United States v. Jones,* 693 F.2d 343, 346 (5th Cir.1982) (citing *United States v. Nicoll,* 664 F.2d 1308, 1314 (5th Cir.1982)); *Greenfield,* 574 F.2d at 307 (citing *United States v. Avila,* 443 F.2d 792, 795 (5th Cir.1971)). This determination is left to the sound discretion of the trial judge. *Greenfield,* 574 F.2d at 307.

■ In the instant case, the Court has conducted a review of the digital copy of the entire naturalization interview, with the assistance of a court-certified interpreter. Having reviewed the digital copy, the Court finds that the inaudible portions are not so substantial as to render the digital copy untrustworthy. The Court's review of the digital copy reveals that several of the passages marked "inaudible" in the Government's transcript are, in fact, clearly audible. Accordingly, to the extent Defendant seeks to exclude the tapes as containing inaudible portions, the Defendant's Motion is denied.

### 2. Inaccuracy of the Transcription

■ The Fifth Circuit allows the use of tape recordings as long as the party seeking their introduction has laid a proper foundation and the tapes constitute real, as opposed to testimonial, evidence. *United States v. Onori,* 535 F.2d 938, 947 (5th Cir.1976). When a trial court allows introduction of a tape, it will often allow the introduction of transcripts of the tape to assist the jury. *Id.; see also United States v. Thompson,* 482 F.3d 781, 787–89 (5th Cir.2007) ("A supplemental transcript is intended only to aid the jury in its assessment of real evidence."). Whether a

trial court will allow the introduction of a transcript lies within the trial court's sound discretion. *Onori,* 535 F.2d at 947 (citing *United States v. McMillan,* 508 F.2d 101, 105 (8th Cir.1974)). "[I]t is unnecessary for the trial court to decide whether a transcript is accurate before that transcript is given to the jury, so long as each side to the dispute is given an opportunity to submit a transcript containing its version of a conversation." *Id.* at 948.

■ In the instant case, as stated above, the Court has conducted a review of the digital copy and compared it with the transcript provided by the Government. Having compared the transcript with the digital copy, the Court has serious concerns about its admissibility. The transcript is imprecise, indicates that many sections are inaudible when they are not, thus omitting key elements of the naturalization interview, and appears to have been transcribed by several different people of varying skill. In short, it does not even approach what would be considered a true and accurate representation of the interview. Though the *Onori* court held that it is unnecessary for a trial court to determine whether a transcript is inaccurate before submission to a jury, it also held that whether or not to even allow introduction of a transcript lies within the trial court's discretion. Moreover, it is this Court's sworn duty to allow only reliable evidence to be submitted to the jury. *See* FED.R.EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.")

The Court finds that the transcript in this case is so inaccurate that it is not

reliable. The danger of prejudice that would result from submitting this proposed evidence to the jury far outweighs its probative value. As such, to the extent the Defendant seeks to exclude the transcript, Defendant's Motion is granted.

For reasons which will be discussed below, the indictment in this case shall be dismissed. However, were this not the case, there would still be plenty of time for the Government to submit a new version of the transcript to the Court before trial. Defendant would be urged to submit his own version of the transcript, at which point the Court would be in a position to follow the instructions in *Onori.* Alternatively, when the Government completed its new version of the transcript, Defendant would have the option of stipulating to its accuracy.

### 3. Inaccuracy of the Interpretation

■ Neither party has provided, nor can this Court find, any case specifically dealing with the quality of an interpretation during the course of a naturalization interview. It is, however, well accepted that "the presence of a competent interpreter is critical to the fairness of a [deportation] hearing." *See Kotasz v. I.N.S.,* 31 F.3d 847, 850 n. 2 (9th Cir.1994) (discussing an alien's fundamental right to a full and fair hearing in deportation proceedings and the importance of a competent interpreter as an element of such hearing). This Court finds that, in this case, the presence of a competent interpreter was also critical to the fairness of the naturalization interview because the interpreter was provided by the Government and the statements made later served as the basis for Defendant's criminal indictment. As such, this Court's task is to determine whether or not the interpreter at issue in this case, provided by the Government though they were under

no obligation to do so, adequately interpreted the statements made between the interviewers and Defendant.

The Ninth Circuit addressed an issue similar to the one presented in the context of a deportation proceeding. In *Perez–Lastor v. INS,* 208 F.3d 773 (9th Cir.2000), the Ninth Circuit reviewed findings by the Board of Immigration Appeals ("BIA") that the petitioner failed to establish eligibility for asylum or withholding from deportation because his testimony was not sufficiently consistent, specific, and credible. *Perez–Lastor,* 208 F.3d at 775. The BIA also ruled that the quality of the translation provided at Perez–Lastor's hearing did not violate due process. *Id.* In reversing the BIA and holding that Perez–Lastor did not receive due process at his deportation hearing because an incompetent interpretation prevented him from presenting relevant evidence, the Ninth Circuit employed a two step inquiry. *Id.* at 777–83. First, the Ninth Circuit asked whether or not the interpretation was a competent one. *Id.* at 778. In evaluating this question, the Court identified three types of evidence tending to prove that the interpretation was incompetent: (1) direct evidence of incorrectly interpreted words, (2) unresponsive answers by the witness, and (3) the witness' expression of difficulty understanding what is said to him. *Id.* Upon a finding that the interpretation was incompetent, the Ninth Circuit went on to ask whether the incompetent interpretation prejudiced the outcome of Perez–Lastor's case in that it potentially affected the outcome of the proceedings. *Id.* at 780. Deciding that it did, the court held that the testimony given at the hearing could not be considered as evidence in any future hearing because the poor interpretation cast doubt upon its accuracy. *Id.* at 783.

This Court is cognizant of the distinction between a deportation hearing, which is imposed by the Government, and a naturalization interview, in which the petitioner seeks a benefit from the Government. However, the principles regarding the accuracy of an interpretation are the same. After all, the purpose of an interpretation is to allow the alien to understand the questions presented to him and to further allow him to communicate his answers to the questioning body. *Id.* at 778. "'A hearing is of no value when the alien and the judge are not understood.'" *Gonzales v. Zurbrick,* 45 F.2d 934, 937 (6th Cir.1930) (quoted in *Perez–Lastor,* 208 F.3d at 778). Again, this is especially true when the Government supplies the interpreter and later uses statements made during the course of the interview as a basis for the indictment.

Turning to the case at bar, the first question that this Court must ask is whether the interpretation was a competent one. This Court has extensively examined the enhanced digital copy multiple times with the aid of a court-certified interpreter and has found numerous instances where words were incorrectly interpreted or not interpreted at all, where Defendant appeared to provide unresponsive answers as a result of his confusion over the questions, and where Defendant expressed difficulty understanding what was said to him. While all of the tapes contained numerous deficiencies, some of the most egregious deficiencies will be discussed below, in chronological order.

### a. Tape 1A

In Tape 1A, Bolanos and Ardinger questioned Defendant about his trip through Mexico en route to the United States. The tape began with the warning statement reprinted above in the background section of this order. While it was read in English, Granados failed to interpret much of it for Defendant. In other words, this is worse than incorrect interpretation because it is no interpretation at all. Though Defendant has, on various occasions, indicated that he understands English, the Court understands that recent injuries and partial loss of hearing have affected his ability to do so. In fact, during the May 4, 2007 hearing, Defendant relied exclusively upon the court-certified interpreter in order to better understand the proceedings.

Indeed, Bolanos began conducting the interview in English, but after about twenty-eight minutes it became clear that Defendant could not understand her. At this point, Bolanos provided Defendant with instructions regarding the use of an interpreter and proceeded to use the interpreter. Thus, because there was no accurate interpretation regarding the introductory warnings, there is no guarantee that Defendant understood the warnings and fully understood his rights.

### b. Tape 1B

Tape 1B involved various questions regarding Defendant's activities in Panama and Guatemala. Common mistakes made by the interpreter involved the use of the wrong words and the omission and/or addition of words to certain questions and answers. This is not an acceptable practice in interpretation, and it caused severe confusion during the interview.

At one point in this discussion, Ardinger asks "But, from the time when you were released from jail in Panama until you entered Mexico in March 2005, March 23rd or 24th, you haven't been to Mexico?" Granados interpreted Ardinger's question as, "Entonces, ¿Desde que Ud. lo habían liberado de Panamá hasta que Ud. entró en México 23 o 24 de Marzo, Ud. nunca había estado en México con anterioridad a esa fecha?," meaning "Then, from the time

you had been freed in Panama until you entered Mexico—23rd or 24th of March, you had never been to Mexico prior to that date?" Tape 1B, 05:12. Ardinger attempted to ask Defendant whether he had been to Mexico after his jail time in Panama and Granados, instead, asked him whether he had been to Mexico before his jail time in Panama. The question that the interviewer asked is not the question that Defendant answered [1], which could potentially cause numerous problems with respect to a time line and the Government's theory as to how he entered the country. This is direct evidence of a substantial incorrect interpretation.

### c. Tape 2A

Tape 2A involved extensive questioning about Defendant's use and possession of various passports. At several points in this tape, the interpreter caused confusion. For example, during one series of questioning, Defendant began with a statement that, "... pero nunca yo he dicho que soy ciudadano americano," meaning "But I have never said that I am an American citizen." Bolanos then asked, "I understand that you never said it—but you did—you did present the U.S. passport to officials, to immigration officials, in a country?" Granados interpreted Bolanos' question as, "Yo entiendo que usted nunca ha dicho, dice usted que nunca ha dicho que es ciudadano americano, pero ¿usted ha presentado documentación a oficiales de inmigración, documentación que creían que usted es americano?," meaning "I understand that you have never said, you say that you have never said that you are an American citizen, but you have presented documentation to immigration officials, documentation that they believed that you were an American?"

In response, Defendant tried to clarify by stating "¿De los Estados Unidos o de ... ?," which means "Of the United States or of...." Granados interpreted this as "In the United States?" Bolanos answered "No, other countries." Granados interpreted this as "No, de otros paises," which means "No, of other countries." Bolanos clarified "On ... in any country." Defendant answered "Sí," which Granados interpreted as "Yes." Finally, Bolanos then stated, "Okay. I'm going to go back and correct the answer to 'yes,' okay?" Finally, the interpreter told Defendant, "Va a cambiar la respuesta de su solicitud a 'sí'. Usted respondío que si," meaning "She is going to change the response in your application to "yes."" You answered "yes." Tape 2A, 2:00.

While this conversation is hard to follow, it appears as though Bolanos was attempting to ask whether Defendant presented a United States passport to immigration offi-

---

1. This is further evidenced by Defendant's discussion about various trips he had taken to Mexico years ago. For example, Defendant responded with, "Pues, sí, pero hace muchos años," meaning, "Well, yes, but it was many years ago." Granados interprets this as, "Yeah, but many, many years ago ..." Ardinger, on the verge of confusion, stated, "I just want to see if I can understand this...." Granados translated this as, "Bueno quiero asegurarme que entiendo todo para mí ...," meaning "Well, I just want to ensure that I understand everything for me." Ardinger continued, "From the time you were released from jail, in 2004, from Panama, until you entered Mexico, on March 23rd or 24th, you have never been to Mexico ... ?" Granados interpreted this as, "Desde el periodo de tiempo transcurrido desde que Usted lo liberaron de la prision en Panama en el año 2004, hasta que Ud. entró en Mexico en Marzo 23 o 24, ¿Ud. no había estado durante ese periodo de tiempo en México?," meaning "From the period of time elapsed since you were released from the prison in Panama in the year 2004, until you entered Mexico in March 23rd or 24th, you had not been in Mexico during that period of time?" Defendant responded, "No."

cials in any country. Granados, instead of interpreting the question asked, broadened the question to whether Defendant had presented any documentation to any immigration officials such that they would believe he was an American. Again, this is an example of a break-down in communication between Bolanos and Defendant, because while Bolanos thought she was asking one question, Defendant thought she was asking another.

In yet another portion of Tape 2A, Bolanos asked "When—one of the—when you were living outside of the United States already, in Venezuela, you applied to come back for a permit, for an extended permit?" Granados interpreted this as "Cuando usted estaba viviendo en Venezuela ¿Usted submitió una solicitud para regresar como, como residente?," which means "When you were living in Venezuela, did you submit an application to return as ... as a resident?" Defendant replied "No." Tape 2A, 04:40. Asking whether Defendant applied for a permit to stay in the United States is completely separate and distinct from asking whether or not he applied for residency. In addition to confusing this Court, Granados apparently confused the interviewers as well, as evidenced by their acknowledgment that this line of questioning was confusing, and that it was time to "move on." This confusion is indication of an incompetent interpretation.

Finally, Bolanos and Ardinger asked Defendant if he had ever committed a crime for which he has not been arrested, at which point Millan stated that Defendant would not answer any questions which were beyond the statutory one year period. Bolanos then called for a break, and upon her return, she stated the following: "Just for the record. Uh, if you are choosing to answer those questions like that, just for the record, just make yourself

clear that your answers are going to be taken into account in the final adjudication of your application for naturalization." Granados summarized her statement as, "Solamente para que quede claro en el acta ... could you repeat the question?," meaning "So it can be clear on the record ... could you repeat the question?" Bolanos then responded, "Just letting him know, that the answers that he is giving today, every answer is going to be taken into account," which Granados interpreted as "Toda respuesta que Ud. de hoy día acá, como ésta que usted ha dado ahora, va a ser tomada en consideración para determinar o no la adjudicación de su petición." In English, what he said was "Every answer that you give today, here, like the one you are giving today, will be taken into account to determine whether to adjudicate your petition or not." Tape 2A, 46.24. Granados summarized and paraphrased Bolanos' statement to such an extent that it caused Bolanos' statements to lose their meaning and effectiveness.

### d. Tape 2B

Tape 2B had the worst audio quality of all the tapes. In it, the interviewers discussed with Defendant his jail time in both Venezuela and Panama. At one point, Defendant attempted to explain the circumstances surrounding his escape from a Venezuelan prison. Around the time Defendant discussed these events, the interviewers warned him that limiting his answers to a one year period "may influence any decision made about his application." Defendant made the statement "Cuando vino lo que se llama la aportación de pruebas ...," which means "when it came time for what is called the presentation of evidence ...," but which was instead interpreted as "when the evidence technicians came...." Tape 2B, 06:30.

Granados was ineffective in communicating Defendant's statements to Bolanos and the DHS attorneys present at the interview. Rather than ask for clarification of either Defendant's or Bolanos' statements, he inserted his own version of the statement, which as it turns out, did not represent the spirit of the conversation.

In another section, Defendant stated "Castro . . . .no se presentó oficialment al juzgado, fue citado por el juzgado y no se presentó a poner la acusación . . . ," which should have been interpreted as "Castro did not appear officially before the Court. He was summoned by the Court and he did not appear to file charges," but was instead interpreted as "Actually, Fidel Castro never showed up in the tribunal to present the charges as he said. . . ." Tape 2B, 15:20.

Granados altered the spirit of the conversation and inserted "as he said," into the statement, changing its meaning. He also referred to appearance before the "court" as appearance before the "tribunal," which carries various connotations and is not in keeping with Defendant's actual responses.

Finally, at one point Ardinger asks "Uh, after you'd been arrested in Panama, did you ever tell any government officials that you had abandoned a plan to detonate a car bomb in Panama?" Granados interpreted this as "Después que fue arrestado, ¿En alguna ocasión le dijo a algún oficial del gobierno norteamericano que usted había desistido de la idea de poner una bomba en un carro, porque muchos panameños podían morir?," which means "After you were arrested, did you at any time tell any official of the North American government that you had abandoned the idea of putting a bomb in a car because many Panamanians could die?" Tape 2B, 25:59.

As discussed above, this is direct evidence of inaccurate interpretation. The difference between asking someone whether they had told a government official that they had abandoned a plan to detonate a car bomb in Panama and whether they told a "North American" official that they had abandoned the idea of putting a bomb in a car because many Panamanians could die is completely different. There is no guarantee that Defendant understood the question being asked him and thus there is *no guarantee that his answer was an accurate one.*

#### e. Tape 3A

Tape 3A involved a discussion about the overthrow of governments. It started with Bolanos swearing-in Defendant for another day of testimony as follows: "We are going to start the review of your— continue—I'm sorry, continue the review of your application. Uh, on question 5— uh—which was the question—where we were discussing the overthrow of governments, I don't think[2] that we did go through that completely, so I'm just going to start here. . . ." Granados interpreted this as: "Eh, vamos a continuar con la revisión de su solicitud. Vamos a seguir donde quedamos que estamos hablando de el derrocamiento de gobiernos," which means, "We are going to continue checking your application. We are going to continue where we stopped, we were speaking about the overthrow of governments." Tape 3A, 5:40. This is an inaccurate interpretation.

In another section, Ardinger asked "Did you ever, yourself, try to recruit an individual to assist in the 1997 and 1998 bomb-

---

**2.** This is one example of a transcription error. The transcript said "I think," completely reversing the meaning of the sentence.

ing in Cuba?" Granados interpreted this as "¿Ud. personalmente se encargo del reclutamiento de alguna persona que participó en estas bombas que explotaron en Cuba en el año 1997 y 1998?," meaning "Did you personally take charge of the recruitment of some/any person who participated in these bombs that exploded in Cuba in the year 1997 and 1998?" Tape 3A, 40:56. Like so many excerpts discussed above, Granados broadened the scope of this question, which raises the issue of whether there could have been effective communication between the people asking the questions and Defendant.

At another point, Ardinger asked, "Uh, I'm going to continue to ask you some questions, I would expect that your attorney is going to have an objection to them....." Granados interpreted this as "Le voy a estar haciendo una series de preguntas ahora. Lo mas probable es que su abogado ponga una objeción a las preguntas," meaning "I'm going to be asking you a series of questions. It is very probable that your attorney will object to the questions." Tape 3A, 42:55. Again, this is inaccurate and may have caused several misunderstandings.

At another point, although the Government had been using the term "objection" throughout the course of the interview, Perry objected to Millan's use of the word "objection." Perry stated "I would just note that 'objection' is not the right term. Your attorney is welcome to provide you advice on what to answer and what not to answer, but this isn't a court hearing and there aren't objections." In addition to numerous other problems implicit with this statement in this context, is the fact that Granados interpreted part of Perry's statement as "this isn't a trial." Tape 3A,

43:42. This is an inaccurate interpretation, which may have affected Defendant's view of what was occurring at the interview.

### f. Tape 3B

Tape 3B involved the issue of overthrowing governments and possession of various passports. In one section, Bolanos asked "Mr. Carriles—sorry, Mr. Posada Carriles, have you ever taught or promoted the overthrow the Cuban government." Granados and Bolanos then seemed to discuss how exactly to proceed with the question. Granados began "Have you ever." Bolanos prompted what seemed like the word "thought," but was actually "taught." Granados asked "Taught or promoted? ..." Bolanos encouraged "Uh-huh." At this point Granados finally posited, "Eh. Sr. Posada Carriles, en elguna ocasión usted ha enseñado o ha promovido ...," meaning "Uh, Mr. Posada Carriles, at some time have you taught or promoted....." Obviously confused, Defendant responded, "Taught? What do you mean taught?" Tape 3B, 00:22.

In order to figure out this section of the tape, the Court, with the assistance of a court-certified interpreter, reviewed the tape approximately fifteen (15) times.[3] It was so difficult to understand Bolanos, that not only did the interpreter require clarification, but the translator and the transcriber got it wrong as well. When the question was finally asked, the Defendant did not understand it. It had to be explained to him.

In another section, Bolanos asked, "Have you ever acquired or been in possession or received an immigration document that was not lawfully issued?" While

---

3. There were several sections of the interview that had to be reviewed between fifteen (15) and twenty (20) times.

both the transcriber and the transcript indicate that she meant "locally issued," indicating that Bolanos was difficult to understand, Granados interpreted this as "¿En alguna ocasión usted ha adquirido, ha poseído, o ha recibido algún documento de inmigración que no sea válido, que no sea verdadero?," which means "At any time have you acquired or possessed or received an immigration document that is not valid, that is not a real document?" Tape 3B, 07:35. While Granados interpreted the statement correctly in the end, the tone and tenor of the tape indicate that Bolanos was so hard for everyone to understand, including the interpreter, that this Court cannot be assured that there was a "meeting of the minds."

In yet another portion of the tape, Bolanos asked "Have you ever received passports from ano ... any other country?" Granados interpreted this as, "¿Y usted en alguna ocasión ha recibido pasaportes que no sean legales de otro país?," which means "And have you at any time received passports that were not legal from another country?" In this question, Granados completely inserted the issue of legality into the question when Bolanos had not. Tape 3B, 11:03.

### g. Tape 4A

Tape 4A involved questions regarding Defendant's use of names and nicknames. This was also the point at which Defendant was asked to initial the changes to his Form N–400 application. Upon termination of the interview, Bolanos stated, "Okay. Uh—we have a complete set of questions for today. We have to—uh— because we all agree, probably, that we have a lot of information to review. We are going to go back and review the application, the testimony, the video and everything. Uh—once we do that, if we still have questions, we're going to set up an-

other appointment to clarify. You're going to have to clarify those answers. Give us an opportunity to clarify your answers, so that we can make a complete adjudication. Okay?" Granados did not interpret this, but merely asked Defendant, in Spanish, if he understood, to which Defendant replied "Yes," but after which Defendant proceeded to make a statement. This is, again, a complete lack of interpretation.

Having concluded that the interpretation is incompetent for various reasons, this Court must next ask whether the incompetent interpretation prejudiced the outcome of Defendant's case in that it potentially affected the outcome of the proceedings. In the instant case, the answer is clear that the Defendant was prejudiced. No effective communication existed between Defendant and the interviewers; they were, so-to-speak, "not on the same page." Bolanos, Ardinger, and Perry believed they were asking one question, while Defendant thought they were asking another. Even in cases where only one or two words were interpreted incorrectly, it completely changed the meaning and tenor of certain questions. In light of the fact that the indictment in this case is based upon statements made during the naturalization interview, this Court finds that the interpretation is so inaccurate as to render it unreliable as evidence of Defendant's actual statements.

The Government's argument that some of these concerns are negated because Millan, Defendant's Spanish-speaking attorney, was present at the interview are completely without merit and unfairly shift the burden for this incompetent interpretation upon defense counsel. First, it is clear from the digital copy that Millan was not present throughout the course of the entire interview. Second, Millan was specifically told at several points during the interview to remain silent or he would forfeit

Defendant's right to the naturalization interview. Third, the proposition that an attorney should zealously advocate for his client while at the same time interpreting various Spanish statements and comparing one's own interpretation to that of another interpreter is absurd. Fourth, there is no measurable standard by which this Court can judge Millan's, let alone any attorney's, proficiency in another language. This Court is already tasked with measuring the reliability of the interpretation and the transcript and will not inquire into the language competency of each defense attorney who represents a non-English speaking client. Finally and importantly, the Government was statutorily authorized to allow Bolanos to conduct the interview without the presence of an interpreter as it appears she is a Spanish speaker herself[4], yet it choose to impose an interpreter into this interview. Not only did the Government impose the interpreter, but when Millan attempted to object to certain questions, Ardinger asked that she be allowed to ask the questions and that they be interpreted.

For the reasons set forth above, the Court finds that the incompetent interpretation prejudiced the outcome of Defendant's proceeding and potentially affected the outcome of both those proceedings and the criminal indictment. The Court further finds that the danger of prejudice resulting from the admission of the interpreted statements far outweighs any probative value they may have because the interpretation was so inherently unreliable. In the end, the statements at issue are not merely evidence of the crime, they are themselves the relevant crime in this case.

Accordingly, the Court will suppress the tapes and transcript as evidence, and further hold that the testimony given at the April 2006 interview should not be considered as evidence in any future hearing because the poor interpretation casts doubt upon its accuracy. *See Perez–Lastor*, 208 F.3d at 783.

## B.  Government Deception

■ Defendant moves to suppress any and all statements uttered during the course of his naturalization interview that took place on April 25 through April 27 of 2006, and to suppress any and all audio or video tapes, documents, and notes containing Defendant's statements uttered during the course of these same interviews. Defendant argues that the Government has been assembling a criminal case against Defendant from as early as April 21, 2005, and that even though Defendant did not qualify for naturalization due to his prior convictions in Panama, the Government nonetheless granted him a naturalization interview for the sole purpose of gathering information for use in a criminal prosecution.

The Government responds by arguing that Defendant invoked the need for the interview by filing an application for naturalization, and thus they did not "entrap" him into an interview for the sake of building a criminal case against him. It argues that Defendant knowingly and voluntarily answered all questions posed to him as illustrated by his decision in exercising his Fifth Amendment rights at various points throughout the interview. The Government contends that it has no duty to "lay

---

**4.**  This is evidenced by the fact that she corrected and/or prompted the interpreter during the naturalization interview at several points. *See* 8 C.F.R. § 335.2(f) ("Use of interpreter. If the use of an interpreter is authorized pursuant to § 312.4 of this chapter, the examin-

ing officer shall note on the application the use and identity of any interpreter. If the Service officer is proficient in the applicant's native language, the Service officer may conduct the examination in that language with the consent of the applicant.")

its cards on the table" during a naturalization interview.

Though the Defendant couches his argument in terms of the Fourth, Fifth, and Sixth Amendments, the concern in the instant case is more accurately categorized as one of due process. In fact, several courts have addressed the core of Defendant's concern. Some courts refer to the issue as one of due process or abuse of process, some as government deception, and still others as improper administration of justice. *See, e.g., United States v. Blocker*, 104 F.3d 720, 728 (5th Cir.1997) ("government deception"); *SEC v. ESM Gov't Sec., Inc.*, 645 F.2d 310, 315–16 (5th Cir.1981) ("deliberate deception" and "abuse of process"); *United States v. Mahaffy*, 446 F.Supp.2d 115, 124 (E.D.N.Y. 2006) ("improper administration of justice"); *United States v. Schroder*, 2006 WL 3717896, at *3 (S.D.Ala.2006) ("material misrepresentation"); *United States v. Stringer*, 408 F.Supp.2d 1083, 1087 (D.Or. 2006) ("due process"); *United States v. Scrushy*, 366 F.Supp.2d 1134, 1138 (N.D.Ala.2005) ("improper administration of justice"); *United States v. Teyibo*, 877 F.Supp. 846, 855–56 (S.D.N.Y.1995) ("improper administration of justice"); *United States v. Parrott*, 248 F.Supp. 196, 200 (D.D.C.1965) ("due process").

The seminal case addressing this issue is *United States v. Tweel*, 550 F.2d 297 (5th Cir.1977). In *Tweel*, an IRS agent asked defendant's accountant if he could review the defendant's tax records as part of an audit. *Tweel*, 550 F.2d at 298. The defendant's accountant asked the IRS agent whether a "special agent" was participating in the investigation. *Id.* The IRS agent's response that no special agent was involved in the investigation, while factually correct, led defendant's accountant to believe that the IRS was merely conducting a civil audit when, in fact, defendant was also the subject of a criminal inquiry. *Id.* at 299. The Fifth Circuit reversed the defendant's conviction for tax evasion and held that mere failure to warn of a criminal investigation, absent any acts by the agent which materially misrepresent the nature of the inquiry, do not constitute fraud, deceit, and trickery. *Id.* The Fifth Circuit held that the IRS agent's failure to apprise defendant of the obvious criminal nature of the investigation "was a sneaky deliberate deception by the agent . . . and a flagrant disregard for [defendant's] rights." *Id.* It categorized such conduct as "shocking" and noted that our revenue system is based upon the good faith of taxpayers and that taxpayers should expect the same good faith from their government. *Id.* at 300.

The Fifth Circuit applied the principles announced in *Tweel* in subsequent cases involving alleged government deception and abuse of process. For example, in *Securities and Exchange Commission v. ESM Government Securities, Inc.*, 645 F.2d 310 (5th Cir.1981), the Fifth Circuit relied on *Tweel* in holding that fraud, deceit, and trickery are grounds for denying enforcement of an administrative subpoena obtained after an SEC investigator gained access to ESM's offices by misrepresenting his purpose and concealing the fact that the SEC was conducting a formal investigation of ESM. *ESM Gov't Sec., Inc.*, 645 F.2d at 317. The Fifth Circuit noted that the key to *Tweel* was the nature of the relationship between the government and the private citizen, and that:

> Inherent in our democracy is a belief that, since the government represents the will of the people, the people will accept its dictates voluntarily. There is a sense of trust between the government and the people. It was the abuse of this

trust which we could not accept in *Tweel.* . . .

*Id.* at 316.

The Fifth Circuit was particularly concerned with the SEC's deceptive tactics, stating that "[w]e believe that a private person has the right to expect that the government, when acting in its own name, will behave honorably," and further that "[w]e think it clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust." *Id.* at 316. Indeed, the Fifth Circuit's disgust with the Government's conduct in *ESM Government Securities, Inc.* is best expressed in their own language:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means[,] to declare that the Government may commit crimes in order to secure the conviction of a private criminal[,] would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

*Id.* at 316–17.

The Fifth Circuit refined these principles in *United States v. Blocker*, 104 F.3d 720 (5th Cir.1997). In *Blocker*, a state insurance auditor tasked with examining defendant's insurance records came across information which caused him to suspect that the defendant had been engaging in criminal activity. *Blocker*, 104 F.3d at 723–24. He brought this information to the attention of the FBI, and promised to and eventually did supply them with evidence of criminal activity that he encountered during the course of his work. *Id.* at 724. The trial court denied the defendant's motion to suppress the evidence, and the Fifth Circuit affirmed. *Id.* at 725. It rejected the defendant's attempt to rely on "government agent 'deception' cases," distinguishing it from *Tweel* in that the DOJ had not specifically requested the insurance auditor to gather information regarding criminal activity. *Id.* at 729. Whereas in *Tweel* there was no "genuine" civil audit, merely a criminal audit falsely represented as a routine civil audit, the Fifth Circuit found that Blocker's case involved a genuine civil audit separate and apart from the criminal investigation. *Id.*

While these Fifth Circuit cases involved government deception in the context of securing documents and papers in violation of the Fourth Amendment, various courts also have extended similar principles into the realm of statements acquired in violation of the Fifth Amendment. For example, in *United States v. Guerrina*, 112 F.Supp. 126 (E.D.Pa.1953), a district court excluded statements obtained by an IRS agent who testified that the purpose of his presence at the defendant's office during what he represented to be an audit was actually to obtain evidence of fraud for contemplated criminal prosecutions, which he did not reveal to the defendant. *Guerrina*, 112 F.Supp. at 128. The district court discussed Fourth Amendment cases in which evidence obtained by stealth was equally as violative of the Fourth Amendment as evidence obtained by force or coercion. *Id.* The court stated, "I can see

no difference between a search conducted after entrance has been gained by stealth or in the guise of a business call, and a search for criminal purposes conducted under the guise of an examination for purely civil purposes." *Id.* at 129.

The practice of excluding statements obtained as a result of "government deception" has found widespread acceptance in the context of securities fraud. For example, in *United States v. Parrott,* 248 F.Supp. 196 (D.D.C.1965), the district court held that the Government could not bring a parallel civil proceeding and avail itself of liberal discovery tactics in order to obtain evidence for a subsequent criminal investigation. *Parrott,* 248 F.Supp. at 199. The Court relied upon its supervisory authority over the manner in which federal agents exercise their power, and stated that:

> [D]ue process is not observed if an accused person is subjected, without his consent, to an administrative hearing on a serious criminal charge that is pending against him. His necessary defense in the administrative hearing may disclose his evidence long in advance of his criminal trial and prejudice his defense in that trial.

*Id.* at 200 (quoting *Silver v. McCamey,* 221 F.2d 873, 874–75 (D.C.Cir.1955)).

The court noted the danger of prejudice that results when a defendant testifies at a civil proceeding and is unaware of pending criminal charges. *Id.* The court cited case law indicating that even if defendants are given warnings against self-incrimination in such circumstances, such warnings have little significance when a defendant does not receive an explanation of the true import of the inquiry. *Id.* at 201. Finally, the found the Government's long delay in returning the indictment, in combination with its deceptive tactics, sufficient

grounds to dismiss the indictment. *Id.* at 202.

In another securities fraud case, a district court sitting in New York used a slightly different analysis and rejected the defendant's arguments that his due process rights had been violated. *Teyibo,* 877 F.Supp. at 855–57. In *Teyibo,* the district court noted that "[t]he prosecution may use evidence acquired in a civil action in a subsequent criminal proceeding unless the defendant demonstrates that such use would violate his constitutional rights or depart from the proper administration of justice." *Id.* at 855. The court recognized the Supreme Court's language regarding various circumstances that might lead to a finding that a defendant's right to due process had been violated, including cases in which the Government pursues a civil action solely to obtain evidence for a criminal prosecution and cases in which the Government fails to advise the defendant during a civil proceeding that it is contemplating criminal prosecution, but found that in the case at hand the Government had not pursued the civil action solely to obtain evidence for a criminal prosecution. *Id.* at 856. The court also found it important that the relevant SEC investigation continued for more than two years and that the SEC did not consult with the United States Attorney in any substantive way. *Id.* at 856.

In *United States v. Scrushy,* 366 F.Supp.2d 1134 (N.D.Ala.2005), a district court again had the opportunity to address "whether the Government departed from the proper administration of criminal justice" in procuring deposition testimony. *Scrushy,* 366 F.Supp.2d at 1137. In *Scrushy,* an accountant with the SEC scheduled a deposition with the defendant for March 14, 2003. *Id.* at 1135. Unbeknownst to the defendant, the SEC accountant received a call from the United

States Attorney's Office shortly before the deposition was scheduled to take place that lasted fifteen to twenty minutes, and in which the United States Attorney's Office gave the SEC advice or preferences as to the content of the deposition and its location. *Id.* at 1136–37. During this conversation, the SEC accountant learned that defendant was possibly involved in a massive fraud investigation, but did not disclose this fact to the defendant during their meeting. *Id.* The court held that the civil and criminal investigations "improperly merged" when the SEC agreed to change the location, content, and length of its deposition in order to accommodate the United States Attorney's Office. *Id.* at 1139. The court found that the Government had manipulated the simultaneous investigations for its own purposes, and that such practices deviated from the proper administration of justice. *Id.* at 1140. "Our justice system cannot function properly in the face of such cloak and dagger activities by those charged with upholding the integrity of the justice system." *Id.* at 1139–40.

In *United States v. Stringer*, 408 F.Supp.2d 1083 (D.Or.2006), the defendant succeeded on a similar strategy, arguing that the Government violated his due process rights because he was not advised that the prosecutor and the FBI were using the SEC to gather evidence in support of a criminal investigation. *Stringer*, 408 F.Supp.2d at 1087. In *Stringer*, the court found that the United States Attorney's Office identified defendant as a possible target in a criminal investigation and chose to gather information through the SEC because of a concern that the presence of a criminal investigation would involve less cooperative witnesses and witnesses more likely to invoke their constitutional rights. *Id.* at 1087–88. The court found that the United States Attorney's Office consistently believed that criminal prosecution was likely, and was actively involved in the SEC investigation by meeting regularly, receiving documents, requesting location of interviews, advising what information was needed for a successful criminal prosecution, and intentionally hiding its presence from defense counsel. *Id.* at 1088. Finally, the court addressed two standards for dismissing an indictment: (1) that the Government engaged in deceit, trickery, or intentional misrepresentation, and (2) that the Government's conduct was " 'so grossly shocking and so outrageous as to violate the universal sense of justice.' " It found that the Government's conduct in the case met both. *Id.* at 1089. The court dismissed the indictment, reserving the right to suppress the statements if the case was returned overturned on appeal. *Id.* at 1089.

A similar strategy appeared in *United States v. Mahaffy*, 446 F.Supp.2d 115 (E.D.N.Y.2006), wherein the defendant argued, unsuccessfully, that his statements should be suppressed based on the Government's tactics used in securing his statements. *Mahaffy*, 446 F.Supp.2d at 126. The Court briefed *Tweel, Parrott, Scrushy,* and *Stringer* but found that the Government's conduct in obtaining Mahaffy's testimony was not so egregious as "to constitute a violation of the universal sense of justice." *Id.* at 126. The court found that the SEC's decision to obtain the defendant's testimony was separate and distinct from any investigation by the United States Attorney's Office, the SEC did not receive any suggestions as to the content of their questions, and at no time did the United States Attorney's Office inform the SEC that the defendant was the subject of a criminal investigation. *Id.* More importantly, both defendant and his attorney were well aware of the criminal investiga-

tion prior to appearing for questioning in the civil investigation. *Id.*

In this instant case, the evidence is overwhelming that the Government improperly manipulated the administration of criminal justice in order to secure a criminal indictment(s) against Defendant. As an initial matter, the USCIS adjudications officer, Bolanos, testified that she had already determined that Defendant was probably not eligible for citizenship but nonetheless chose to interview him. She testified that she never denied naturalization without an interview, even though the standard practice in El Paso—where Defendant's interview took place—is to deny a petitioner a naturalization interview if it is clear that such petitioner is unlikely to receive citizenship status. This initial determination of Defendant's ineligibility, Bolanos stated, was based upon Defendant's previous conviction for aggravated assault in Panama.

Though the Government represented to this Court that these facts are not evidence that the naturalization interview was in vain and merely a pretext for a criminal investigation because "an applicant who has received a pardon is not precluded from demonstrating good moral character, [8 C.F.R. § 316.10(c)(2) ]," see Gov't's Resp. to the Def.'s Mot. to Suppress Evidence and Statements 2, the USCIS denied Defendant naturalization partly based on that exact reason. *See* USCIS Decision of August 24, 2006 ("[T]here is no indication in the regulation nor in its promulgation that pardons in the naturalization context are to be treated differently from the established rule that foreign pardons do not remove the immigration consequences of convictions. Therefore, *USCIS*

finds that your pardon is not effective for immigration purposes.") (emphasis added). By September 27, 2005—well before the April 2006 interview—the Government had collected extensive materials related to Defendant's conduct and had already held an immigration hearing on whether he should be deported. For the Government to come into this Court and argue that its only purpose in holding the naturalization interview was to determine his good moral character is completely disingenuous. Finally, the interview was anomalous in that: (1) it lasted eight hours over the course of two days as opposed to the usual maximum of thirty minutes, (2) it involved two interviewers, (3) the Government provided an interpreter, (4) there were a total of four attorneys present— two defense attorneys and two Government attorneys [5], and (5) it was both audio and videotaped.[6] All of these facts tend to indicate that, as discussed in *Blocker* and *Guerrina,* there was no genuine administrative interview and the entire interview was, instead, a pretext for a criminal investigation.

In addition to the irregularities inherent in the interview itself, the Court finds the DOJ's involvement with the case suspicious. For example, Bolanos testified that approximately one month prior to Defendant's naturalization interview, she met with an unnamed attorney from the DOJ and attorneys from DHS to "discuss the flow" of questions. Though she was evasive when pressed to discuss exactly what she meant by "flow," she was very clear that everyone at the meeting "reviewed" the questions. This case is analogous to

---

**5.** The Court notes that this interview involved more attorneys than most criminal trials before this Court.

**6.** Curiously, even though Bolanos refers to the fact that the interview has been video-

taped on the second day of the naturalization interview, she now testifies that video is unavailable because the equipment malfunctioned—a first in her experience.

that of *Scrushy* and *Stringer*, and distinguishable from *Teyibo* and *Mahaffy*, because the DOJ was directly involved in assisting USCIS prepare for Defendant's administrative interview.

Although the Government provided so-called "warnings" to Defendant at the beginning of the interview, as in *Parrott*, these warnings had little significance. The warnings were read to Defendant in English without any Spanish interpretation, Defendant's attorney was continually threatened that exercise of Fifth Amendment rights might result in termination of the naturalization interview, and, more importantly, Defendant did not receive an explanation of the true import of the Government's inquiry. *See Parrott*, 248 F.Supp. at 200; *United States v. Thayer*, 214 F.Supp. 929, 932 (D.Colo.1963) ("The fact that the accused has been warned that false answers can result in a perjury prosecution can be of little value in circumstances where the defendant may have been misled by the fact that the main object of the investigation appeared to be inquiry as to substantive violations. A warning in such circumstances could not be effectual unless it includes a full disclosure to the effect that a perjury charge is then being contemplated and is almost sure to follow if the defendant persists in the answers which he has been giving.").

While the Government tries to distinguish these many cases based on the fact that each case involved a mandatory Government investigation while Defendant in this case sought a benefit from the Government, the Court finds the argument a difference without distinction in the instant case. Defendant was being held in DHS custody, had been ordered removed but had no country willing to accept him, and had to choose between applying for naturalization or possibly being subject to indefinite detention. In other words, Defen-

dant had few options and the Government took advantage of his situation and manipulated it to serve its own ends.

This Court finds that the Government engaged in fraud, deceit, and trickery when it misrepresented to Defendant that the purpose of asking him such extensive questions about his means of entry into the United States, his conduct in Panama and Venezuela, and his use of various aliases and passports was merely to "clarify the record." The Court ponders exactly which record the Government sought to clarify. The Government did not merely ask him questions directed towards a moral character determination. They questioned him extensively about bombings and other violent activities. The mere fact that they had to question him about bombings belies the argument that this was a routine naturalization interview.

Furthermore, throughout the interview, Millan attempted to advise Defendant to exercise his Fifth Amendment rights, yet invariably Bolanos, Ardinger, or Perry would retort "this is just for purposes of the record." In addition to engaging in fraud, deceit, and trickery, this Court finds the Government's tactics in this case are so grossly shocking and so outrageous as to violate the universal sense of justice. As a result, this Court is left with no choice but to dismiss the indictment.

## III. CONCLUSION

The realm of this case is not, as some have suggested, terrorism. It is immigration fraud. Terrorism, and the determination of whether or not to classify an individual as a terrorist, lies within the sound discretion of the executive branch. It does not lie with this Court.

In 2006, the Western District of Texas saw 2,441 new criminal cases filed, a great number of which involve immigration charges. This Court, in particular, has

been noted as having one of the heaviest criminal immigration dockets in the entire nation. As such, the issues with which this Court is currently faced are ordinary, not extraordinary. The Court routinely presides over trials and formulates sentences for defendants facing the same charges as those faced by the Defendant in this case. For example, a typical defendant convicted of all seven counts with which Defendant is currently charged would receive a maximum sentence of six to twelve months under the United States Sentencing Guidelines. In addition, any time that such defendant served in federal incarceration would more likely than not qualify such defendant for time served, or at the very least, probation.

As with each and every defendant who comes before this Court, Defendant in this case is entitled to certain rights under the United States Constitution. This Court will not set aside such rights nor overlook Government misconduct because Defendant is a political hot potato. This Court's concern is not politics; it is the preservation of criminal justice.

For the reasons set forth above, Defendant's Motion to Exclude Tapes and Transcripts (Doc. No. 82) is **GRANTED** and the transcript, interpretation, and testimony from the hearing are hereby excluded. Defendant's Motion to Suppress Evidence (Doc. No. 80) is **GRANTED** and any and all statements that Defendant uttered during the course of his naturalization interview are hereby suppressed. Finally, the indictment is hereby **DISMISSED.** All remaining motions shall be **DENIED** as moot.

**SO ORDERED.**