**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellant,*

              v.

J. KENNETH STRINGER, III; J. MARK
SAMPER; WILLIAM N. MARTIN,
           *Defendants-Appellees.*

No. 06-30100

D.C. No.
CR-03-00432-ALH

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
September 26, 2007—Portland, Oregon

Filed April 4, 2008
Amended July 31, 2008

Before: Mary M. Schroeder, Barry G. Silverman and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Schroeder

## COUNSEL

Karin J. Immergut, United States Attorney; Hannah Horsley, Assistant United States Attorney; and Kelly A. Zusman, Assistant United States Attorney, Portland, Oregon, for plaintiff-appellant United States of America.

Janet Lee Hoffman, Hoffman Angeli LLP, Portland, Oregon, for defendant-appellee J. Kenneth Stringer, III.

Ronald H. Hoevet, Hoevet, Boise & Olson, P.C., Portland, Oregon, for defendant-appellee Mark Samper.

John S. Ransom and Kendra Matthews, Ransom Blackman LLP, Portland, Oregon, for defendant-appellee William Martin.

## ORDER

The opinion in this matter filed on April 4, 2008, and published at *United States v. Stringer*, 521 F.3d 1189 (9th Cir. 2008), is amended as follows:

On slip op. 3549, replace the listed counsel, lines 3-10, with the following:

> Karin J. Immergut, United States Attorney; Hannah Horsley, Assistant United States Attorney; and Kelly A. Zusman, Assistant United States Attorney, Portland, Oregon, for plaintiff-appellant United States of America.

Janet Lee Hoffman, Hoffman Angeli LLP, Portland, Oregon, for defendant-appellee J. Kenneth Stringer, III.

Ronald H. Hoevet, Hoevet, Boise & Olson, P.C., Portland, Oregon, for defendant-appellee Mark Samper.

John S. Ransom and Kendra Matthews, Ransom Blackman LLP, Portland, Oregon, for defendant-appellee William Martin.

On slip op. 3550, replace the first full paragraph with the following:

Accepting the district court's factual findings under the clear error standard, we hold that the government's conduct does not amount to a constitutional violation under either the Fourth or Fifth Amendments. We vacate the dismissal of the indictments because in a standard form it sent to the defendants, the government fully disclosed the possibility that information received in the course of the civil investigation could be used for criminal proceedings. There was no deceit; rather, at most, there was a government decision not to conduct the criminal investigation openly, a decision we hold the government was free to make. There is nothing improper about the government undertaking simultaneous criminal and civil investigations, and nothing in the government's actual conduct of those investigations amounted to deceit or an affirmative misrepresentation justifying the rare sanction of dismissal of criminal charges or suppression of evidence received in the course of the investigations.

On slip op. 3556, replace the last sentence of the second paragraph with the following:

Rosenbaum represented Meussle, as well as Samper and FLIR.

On slip op. 3559, replace the citation sentence in the first partial paragraph with the following:

> *See, e.g.*, *United States v. Carriles*, 486 F. Supp. 2d 599, 615, 619 (W.D. Tex. 2007), *appeal pending*, No. 07-50737 (5th Cir.); *United States v. Rand*, 308 F. Supp. 1231, 1233, 1237 (N.D. Ohio 1970).

On slip op. 3568, insert the following as the first full paragraph:

> The panel shall retain jurisdiction over any subsequent appeal in this matter.

Defendant-Appellee Martin's Petition for Rehearing En Banc, Defendant-Appellee Stringer's Petition for Rehearing and Suggestion for Rehearing En Banc, and Defendant-Appellee Samper's Petition for Rehearing En Banc are denied. No subsequent petition for rehearing or rehearing en banc may be filed.

---

## OPINION

SCHROEDER, Circuit Judge:

## I.  Introduction

The United States appeals from a final order of the district court dismissing criminal indictments against three individual defendants charging counts of criminal securities violations. The dismissal was premised on the district court's conclusion that the government had engaged in deceitful conduct, in violation of defendants' due process rights, by simultaneously

pursuing civil and criminal investigations of defendants'
alleged falsification of the financial records of their high-tech
camera sales company. Foreseeing the possibility of an
appeal, the district court held that the indictments must be dis-
missed, but ruled in the alternative that, should there be a
criminal trial, all evidence provided by the individual defen-
dants in response to Securities and Exchange Commission
("SEC") subpoenas should be suppressed. *See United States
v. Stringer*, 408 F. Supp. 2d 1083 (D. Or. 2006).

The court also suppressed evidence relating to the "Swed-
ish Drop Shipment," an allegedly fraudulent accounting entry.
The district court reasoned that the government had improp-
erly interfered with, or intruded into, the attorney-client rela-
tionship of one of the defendants by accepting incriminating
evidence about the entry from a defense attorney. The attor-
ney had an apparent conflict of interest because she repre-
sented the corporation as well as an individual defendant.

Accepting the district court's factual findings under the
clear error standard, we hold that the government's conduct
does not amount to a constitutional violation under either the
Fourth or Fifth Amendments. We vacate the dismissal of the
indictments because in a standard form it sent to the defen-
dants, the government fully disclosed the possibility that
information received in the course of the civil investigation
could be used for criminal proceedings. There was no deceit;
rather, at most, there was a government decision not to con-
duct the criminal investigation openly, a decision we hold the
government was free to make. There is nothing improper
about the government undertaking simultaneous criminal and
civil investigations, and nothing in the government's actual
conduct of those investigations amounted to deceit or an affir-
mative misrepresentation justifying the rare sanction of dis-
missal of criminal charges or suppression of evidence
received in the course of the investigations.

We also reverse the order excluding evidence received
from the conflicted attorney. We do so because the govern-

ment advised the attorney of the existence of a potential conflict and did not interfere with the attorney-client relationship.

## II. Background

### A. The concurrent SEC civil and U.S. Attorney criminal investigations

Prior to the criminal action that forms the basis of this appeal, the SEC began investigating the defendants, J. Kenneth Stringer, III, J. Mark Samper, and William N. Martin, and their company for possible civil securities fraud violations. The company was FLIR Systems, Inc. ("FLIR"), an Oregon corporation headquartered in Portland that sells infrared and heat-sensing cameras for military and industrial use. The SEC began the investigation on June 8, 2000. About two weeks later, the SEC held the first of a series of meetings with the Oregon United States Attorney's Office ("USAO") to coordinate the ongoing SEC investigation with a possible criminal investigation. An SEC Assistant Director and an SEC Staff Attorney met with the supervisor of the white collar crime section of the USAO to discuss the possibility of opening a criminal investigation. The meeting apparently convinced the USAO supervisor to investigate. Within days, the USAO and the Federal Bureau of Investigation ("FBI") opened a criminal investigation.

Federal securities laws authorize the SEC to transmit evidence it has gathered to the USAO to facilitate a criminal investigation by the USAO. *See* 15 U.S.C. §§ 77t(b), 78u(d). To gather evidence for its criminal investigation, the Oregon USAO in June of 2000 sent a letter to the SEC (the "Access Letter") requesting access to the SEC's non-public investigative files, and the SEC promptly granted access.

The civil and criminal investigations proceeded in tandem and the SEC continued to meet and communicate with the

USAO and FBI. The SEC turned over documents the SEC collected through its civil investigation.

At the beginning of the criminal investigation, the USAO identified two of the three defendants, FLIR's former CEO, Stringer, and former CFO, Samper, as possible targets, and named them in the USAO's Access Letter to the SEC. A few months later, in October 2000, the Assistant United States Attorney ("AUSA") assigned to the case made a list of the subjects of the investigation and placed asterisks and the comment "knew what [was] going on" next to the entries for Samper and Stringer. A month later, the AUSA stated in his handwritten notes that Stringer had "lied [about] his role in" the company. In April 2001, an e-mail from the SEC Staff Attorney to the SEC Assistant Director stated the AUSA "define[d] [the] targets as Ken Stringer and Mark Samper."

The district court concluded that the third defendant, Martin, former VP of Sales, was also an early potential target of the criminal investigation. Martin appears on the AUSA's early list of the subjects of the investigation above the comment "knew pushing up sales." During a January 2001 meeting, the SEC advised the USAO and FBI that FLIR was blaming Stringer and Martin for the fraudulent conduct at the heart of the investigation.

Early in the criminal investigation, the USAO decided the investigation should remain confidential. At an October 2000 meeting between the SEC, USAO, and FBI, the AUSA advised that the evidence collected by the SEC might support criminal wire fraud charges. Nonetheless, an internal FBI memo issued in late October stated that the AUSA had concluded, based on the defendants' cooperation with the SEC at that point, that the SEC should investigate "without the assistance or inclusion of the FBI." At the January 2001 meeting between the SEC, FBI, and USAO, the SEC revealed that FLIR was cooperative and was providing evidence that was damaging to Stringer and Martin.

By June 2001, the USAO was not yet ready to convene a grand jury and issue indictments. The SEC and USAO believed that FLIR and defendant Samper would settle with the SEC so long as the U.S. Attorney was not directly involved. During a December 2001 phone conversation between the AUSA assigned to the case and the SEC Assistant Director, the AUSA continued to believe it was "premature [sic] to surface" and that the presence of an AUSA would "impede" a meeting between the SEC and defendants. During a December 2002 phone call, the SEC and USAO decided that the USAO would not "surface", i.e., convene a grand jury and issue indictments, until the "end of Jan/early Feb" 2003.

The SEC facilitated the criminal investigation in a number of ways. The SEC offered to conduct the interviews of defendants so as to create "the best record possible" in support of "false statement cases" against them, and the AUSA instructed the SEC Staff Attorney on how best to do that. The AUSA asked the relevant SEC office, located in Los Angeles, to take the depositions in Oregon so that the Portland Office of the USAO would have venue over any false statements case that might arise from the depositions, and the SEC did so. Both the SEC and USAO wanted the existence of the criminal investigation kept confidential. The SEC Staff Attorney, at one of the Portland depositions, made a note that she wanted to "make sure [the] court reporters won't tell [FLIR's Attorney]" that there was an AUSA assigned to the case.

The SEC, however, did not hide from the defendants the possibility — even likelihood — of such an investigation. The SEC sent each of the defendants subpoenas in the summer of 2001, and attached to each was Form 1662, a form sent to all witnesses subpoenaed to testify before the SEC. Under the header "Routine Uses of Information," the four-page form states that "[t]he Commission often makes its files available to other governmental agencies, particularly the United States Attorneys and state prosecutors. There is a likelihood that

information supplied by you will be made available to such agencies where appropriate."

Form 1662 also advises witnesses of their Fifth Amendment rights. After the heading "Fifth Amendment and Voluntary Testimony," the form states that:

> Information you give may be used against you in any federal . . . civil or criminal proceeding brought by the Commission of any other agency. You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment of the Constitution of the United States, to give any information that may tend to incriminate you or subject you to fine, penalty, or forfeiture.

None of the defendants invoked his right against self-incrimination during his deposition, and all proceeded to testify in compliance with the subpoena. Each of the defendants was represented by counsel when he testified.

During the course of Stringer's deposition, taken in Portland in October 2001, Stringer's attorney actually questioned the SEC Staff Attorney about the involvement of the USAO. In response to those questions, the SEC Staff Attorney answered as follows:

> MR. MARTSON: My first question is whether Mr. Stringer is a target of any aspect of the investigation being conducted by the SEC.
>
> STAFF ATTORNEY: The SEC does not have targets in this investigation.
>
> MR. MARTSON: The other questions I have relate to whether or not, in connection with your investigation, the SEC is working in conjunction with any other department of the United States, such as the

> U.S. Attorney's Office in any jurisdiction, or the Department of Justice.
>
> STAFF ATTORNEY: As laid out in the 1662 form, in the "routine use of" section there are routine uses of our investigation, and it is the agency's policy not to respond to questions like that, but instead, to direct you to the other agencies you mentioned.
>
> MR. MARTSON: And which U.S. Attorney's Office might I inquire into?
>
> STAFF ATTORNEY: That would be a matter up to your discretion.

The record does not show the SEC did anything to impede an inquiry, nor does it disclose that any inquiry was made. The record reflects that the government never furnished defendants with any false information concerning the existence of a criminal investigation.

In September 2002, a year before the criminal indictments, defendants Samper and Martin entered into consent decrees in the civil action, agreeing to pay penalties, disgorgement, and pre-judgment interest.

## B. The "Swedish Drop Shipment" evidence from the attorney jointly representing defendants

Throughout the course of the SEC investigation, FLIR was represented by attorney Lois Rosenbaum. Defendant Samper, FLIR's former CFO, had retained separate counsel. In March 2000, Rosenbaum sent Samper a letter offering to jointly represent FLIR, Stringer, and Samper. In the letter, Rosenbaum claimed that based on her "present knowledge of the facts," she did not anticipate that any conflicts would arise between the co-clients. The letter, however, advised the clients to consult separate counsel before consenting to the joint representa-

tion and promised immediately to inform the clients if a conflict did arise.

Samper's separate counsel sent a letter to Rosenbaum stating that Samper consented to the "joint representation in spite of the potential conflict of interest that may arise between the clients." Samper's separate counsel continued to represent him as monitoring counsel.

On June 30, 2000, the SEC sent Samper a subpoena with Form 1662 enclosed. It warned of possible dangers of joint representation. The form advised that "[y]ou may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's."

In July 2000, when the SEC learned that Rosenbaum was representing FLIR and its employees, it immediately sent her a letter warning of the specific dangers of this co-representation. "We are concerned that the broad range of interests possessed by your many clients cannot be adequately represented by a single attorney." The letter specifically pointed out the potential conflict of interest in representing a company under investigation by the SEC and upper level management who may have civil liability. The letter stated that, "Although it is far too early in the investigation for the SEC staff to identify people who may possess liability, we are troubled by the scope and breadth of your representation." Rosenbaum continued to represent both FLIR and Samper, among others.

One of the eventual charges in the indictment was that two of the involved defendants created the "Swedish Drop Shipment," an entry in FLIR's books that allegedly recognizes $4.6 million in revenue without substantiation. FLIR's Controller, David Meussle, first discovered the unsubstantiated entry. Meussle believed that Stringer and Samper made the

entry. Rosenbaum represented Meussle, as well as Samper and FLIR.

The SEC civil complaint, filed on September 30, 2002, two years after the joint representation began, did not allege a charge relating to the "Swedish Drop Shipment." After Rosenbaum received a copy of the complaint, she called the SEC Staff Attorney, disclosed the existence of the "Swedish Drop Shipment," and facilitated SEC interviews with Meussle in order to enhance the level of FLIR's cooperation with the government. Rosenbaum also sent a memo to the SEC that contained possibly privileged communications she had with Samper about the transaction. The criminal indictment later charged that Stringer and Samper created the false entry. Thus Rosenbaum, while representing Meussle and FLIR, apparently in order to further the interests of FLIR, assisted the SEC's investigation.

## C. Proceedings Below

On September 17, 2003, a grand jury returned an indictment charging Stringer, Samper, and Martin with securities, mail, and wire fraud. Defendants filed motions to dismiss the indictments and to suppress statements they made to the SEC. The district court dismissed the indictments and suppressed the SEC statements because it concluded that the government, in violation of the due process clause, abused its authority to conduct parallel proceedings. *United States v. Stringer*, 408 F. Supp. 2d 1083, 1088-89 (D. Or. 2006). The district court held that the government violated defendants' Fifth Amendment due process rights by using trickery and deceit to conceal the criminal investigation from defendants, *id.* at 1080, and conducting a criminal investigation under the auspices of a civil investigation, *id.* at 1089. The district court suppressed evidence of the "Swedish Drop Shipment" on the basis of its conclusion that the government interfered with Samper's attorney-client relationship in violation of his due process rights. *Id.* at 1091-92.

This appeal by the government followed. This court has jurisdiction pursuant to 18 U.S.C. § 3731.7

## III. Discussion

### A. The parallel investigations

**[1]** The Supreme Court has held that the government may conduct parallel civil and criminal investigations without violating the due process clause, so long as it does not act in bad faith. *See United States v. Kordel*, 397 U.S. 1, 11 (1970). In *Kordel*, the Supreme Court held that the government did not violate the due process rights of corporate executives when it used evidence it obtained from an FDA civil investigation to convict them of criminal misbranding. 397 U.S. 1 at 11. The Court explained that the FDA did not act in bad faith when it made a request for information, which ultimately was used in the criminal investigation, for the agency made similar requests as a matter of course in 75% of its civil investigations. *Id.* at 6. The Court suggested that the government may act in bad faith if it brings a civil action solely for the purpose of obtaining evidence in a criminal prosecution and does not advise the defendant of the planned use of evidence in a criminal proceeding. *Id.* at 12-13. The Court thus distinguished the *Kordel* investigation from bad faith cases where

> the [g]overnment has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; . . . [or] any other special circumstances . . . might suggest the unconstitutionality or even the impropriety of this criminal prosecution.

*Id.* at 12-13.

**[2]** The Supreme Court has not had occasion to address such issues since *Kordel*, but lower courts have. In *SEC v.*

*Dresser Industries, Inc.*, the D.C. Circuit applied the princi-
ples laid down in *Kordel* to a case involving parallel SEC
civil and Department of Justice criminal investigations. *See*
628 F.2d 1368, 1376-77 (D.C. Cir. 1980) (en banc). The court
emphatically upheld the propriety of such parallel investiga-
tions. "Effective enforcement of the securities laws requires
that the SEC and Justice be able to investigate possible viola-
tions simultaneously." *Id.* at 1377. The court said it would
refuse to bar such investigations absent unusual circum-
stances. *Id.* It said courts should refuse to "block parallel
investigations by these agencies in the absence of 'special cir-
cumstances' in which the nature of the proceedings demon-
strably prejudices substantial rights of the investigated party
or of the government." *Id.*

District courts have occasionally suppressed evidence or
dismissed indictments on due process grounds where the gov-
ernment made affirmative misrepresentations or conducted a
civil investigation solely for purposes of advancing a criminal
case. *See, e.g.*, *United States v. Carriles*, 486 F. Supp. 2d 599,
615, 619 (W.D. Tex. 2007), *appeal pending*, No. 07-50737
(5th Cir.); *United States v. Rand*, 308 F. Supp. 1231, 1233,
1237 (N.D. Ohio 1970).

In this case, the district court concluded that the govern-
ment should have told defendants of the criminal investigation
and that it violated the standards laid down in *Kordel* when
it failed to "advise defendants that it anticipated their criminal
prosecution." *Stringer*, 408 F. Supp. 2d at 1088. It held that
the government engaged in "trickery and deceit" when the
SEC staff attorney instructed court reporters to refrain from
mentioning the AUSA's involvement. When the SEC staff
attorney responded to Stringer's attorney's question, during
Stringer's deposition, by directing him to the U.S. Attorney,
the district court concluded that the SEC attorney "evaded the
question." *Id.* at 1089.

In its appeal, the government argues that it had no legal
duty to make any further disclosure of the existence of the

pending criminal investigation. It points to the warnings in Form 1662 in which the government disclosed the possibility of criminal prosecution, and it stresses that it did not make any affirmative misrepresentations. It maintains the SEC attorney's answer was appropriate and truthful.

The defendants argue that the district court properly held that the use of the evidence obtained by the SEC in a criminal prosecution would violate defendants' Fifth Amendment privilege against self-incrimination. The defendants were advised that the evidence could be used in a criminal investigation, but defendants did not invoke their Fifth Amendment privilege during the SEC investigation. The government on appeal correctly contends that defendants waived or forfeited their Fifth Amendment right against self-incrimination.

**[3]** The privilege against self-incrimination protects an individual from being forced to provide information that might establish a direct link in a chain of evidence leading to his conviction. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). It may be waived if it is not affirmatively invoked. In *Minnesota v. Murphy*, the Supreme Court stressed that the privilege is lost if not affirmatively invoked, even if the defendant did not make a knowing and intelligent waiver. 465 U.S. 420, 428 (1984). We have similarly stated that a "defendant's failure to invoke the privilege against self-incrimination waives a later claim of privilege." *Unruh*, 855 F.2d at 1374 (holding that a defendant waived the privilege when, after being advised of his right not to answer questions, he proceeded to testify in a civil deposition).

**[4]** The district court therefore erred in holding that defendants' waivers of the privilege were ineffective because they were not told of the U.S. Attorney's active involvement. *See Stringer*, 408 F. Supp. 1089-90. The SEC Form 1662 used in this case alerts SEC investigative witnesses that the information can be used in a criminal proceeding. Defendants were on sufficient notice, and so were their attorneys. As one federal

court has explained, all that was required was "sufficient notice . . . that any information could be used against [them] in a subsequent criminal proceeding." *United States v. Teyibo*, 877 F. Supp. 846, 855 (S.D.N.Y. 1995). That court emphasized that "SEC Form 1662 stated in no uncertain terms that the [g]overnment's request for information could be refused pursuant to the Fifth Amendment's protection against compelled self-incrimination." *Id.* We agree.

**[5]** The SEC here went even further, warning each defendant at the beginning of each deposition that "the facts developed in this investigation might constitute violations of . . . criminal laws." Nonetheless, defendants proceeded to testify and failed to invoke their privilege against self-incrimination. Defendants have forfeited any claims that the use of their testimony against them in the criminal proceedings violates the privilege against self-incrimination.

**[6]** The defendants next contend that the district court properly concluded that the government used the civil investigation solely to obtain evidence for a subsequent criminal prosecution, in violation of due process. The Supreme Court in *Kordel* made it clear that dual investigations must meet the requirements of the Fifth Amendment Due Process Clause. *See* 397 U.S. at 11-12. While holding that "[i]t would stultify the enforcement of federal law" to curtail the government's discretion to conduct dual investigations strategically, the Court suggested that a defendant may be entitled to a remedy where "the [g]overnment has brought a civil action solely to obtain evidence for its criminal prosecution." 397 U.S. at 11-12. In this case, the government argues that it did not violate defendants' due process rights because the civil investigation was not commenced solely to obtain evidence for a criminal prosecution.

**[7]** It is significant to our analysis that the SEC began its civil investigation first and brought in the U.S. Attorney later. This tends to negate any likelihood that the government began

the civil investigation in bad faith, as, for example, in order to obtain evidence for a criminal prosecution. In *United States v. Unruh*, 855 F.2d 1363, 1374 (9th Cir. 1987), we held that a defendant was not entitled to dismissal of his indictment when the U.S. Department of the Treasury instituted its investigation before any indictment and in order to file its own civil complaint. *See also United States v. Churchill*, 483 F.2d 268, 272 (1st Cir. 1973); *United States v. Teyibo*, 877 F. Supp. 846, 855 (S.D.N.Y. 1995).

*United States v. Carriles*, 486 F. Supp. 2d 599, 619-21 (W.D. Tex. 2007), on the other hand, is a clear example of government bad faith. The district court dismissed an indictment because the U.S. Citizenship and Immigration Services ("USCIS") interviewed the defendant solely to collect evidence in support of a criminal case against him. 486 F. Supp. 2d at 619-21. The defendant, a Cuban national, filed an application for naturalization. *Id.* at 601. Although USCIS had already determined that the defendant was not eligible for citizenship, the agency nonetheless invited him to a pre-citizenship interview in order to collect evidence for a criminal false statements case. *Id.* at 619. The interview protocol was altered in so many ways to serve the needs of the criminal investigation that it became an interrogation. The court described the "interview" as follows:

> (1) it lasted eight hours over the course of two days as opposed to the usual maximum of thirty minutes, (2) it involved two interviewers, (3) the [g]overnment provided an interpreter, (4) there were a total of four attorneys present—two defense attorneys and two Government attorneys, and (5) it was both audio and videotaped.

*Id.* Because the "entire interview was . . . a pretext for a criminal investigation," the district court dismissed the indictment. *Id.* at 629-20.

**[8]** Our case is not remotely similar to *Carriles*. In this case the SEC's civil investigation was opened first, led to SEC sanctions and was conducted pursuant to the SEC's own civil enforcement jurisdiction. It was not a pretext for the USAO's criminal investigation of defendants. Congress has expressly authorized the SEC to share information with the Department of Justice to facilitate the investigation and prosecution of crimes. *See* 15 U.S.C. §§ 77t(b), 78u(d). We must conclude the SEC interviewed the defendants in support of a bona fide civil investigation. There was no violation of due process.

**[9]** Defendant appellees finally contend that the district court properly concluded that dismissal or, in the alternative, suppression, was warranted because the government lulled the defendants into turning over incriminating evidence by engaging in "trickery and deceit." It was dispositive for the district court that the SEC staff attorney instructed court reporters to refrain from mentioning the AUSA's involvement and that the SEC gave evasive answers to questions about the imminence of a dual investigation. We have previously applied the Fourth Amendment's bar to unreasonable searches and seizures in the context of dual investigations by the civil and criminal branches of the IRS, where review of documentary evidence is inherent in the investigation. We have thus held that a search is unreasonable, even if consensual, if the consent is obtained by trickery or deceit. *See United States v. Robson*, 477 F.2d 13, 18 (9th Cir. 1973). While not every SEC and USAO dual investigation will necessarily involve a search and seizure, to the extent that the individual defendants may have been led through trickery or deceit to turn over documentary or physical evidence in their possession or to use their official authority to turn over evidence in the possession of the corporation, the defendants could state a claim under the Fourth Amendment.

**[10]** A government official must not "affirmatively mislead" the subject of parallel civil and criminal investigations "into believing that the investigation is exclusively civil in

nature and will not lead to criminal charges." *Robson*, 477 F.2d at 18. However, "we have consistently held that the failure of an IRS agent . . . to warn a taxpayer that an audit may have potential criminal ramifications does not render the search unreasonable." *Id.* at 18-19 (denying suppression where an IRS agent did not expressly advise a taxpayer that the evidence the agent was gathering for a civil audit would be used to support a criminal investigation).

[11] Other circuits have agreed that Fourth Amendment and possible due process limitations may be implicated in a dual investigation. *See United States v. Peters*, 153 F.3d 445, 451 (7th Cir. 1998) ( "A consensual search is unreasonable under the Fourth Amendment or violative of due process under the Fifth Amendment if the consent was induced by fraud, deceit, trickery or misrepresentation."). Almost every other circuit has denied suppression, even when government agents did not disclose the possibility or existence of a criminal investigation, so long as they made no affirmative misrepresentations. *See United States v. Irvine*, 699 F.2d 43, 46 (1st Cir. 1983); *United States v. Sclafani*, 265 F.2d 408, 414-415 (2d Cir. 1959); *United States v. Parenti*, 326 F.Supp. 717, 722 (E.D. Pa. 1971), *aff'd*, 470 F.2d 1175 (3rd Cir. 1971); *Groder v. United States*, 816 F.2d 139, 144 (4th Cir. 1987); *United States v. Prudden*, 424 F.2d 1021, 1030 (5th Cir. 1970); *United States v. Marra*, 481 F.2d 1196, 1203 (6th Cir. 1973); *United States v. Lehman*, 468 F.2d 93, 105 (7th Cir. 1972); *United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993); *United States v. Katz*, 705 F.2d 1237, 1243 (10th Cir. 1983); *United States v. Waugneux*, 683 F.2d 1343, 1347 (11th Cir. 1982); *United States v. Stamp*, 458 F.2d 759, 777 (D.C. Cir. 1971).

The district court in this case relied on the Eighth Circuit's opinion in *Grunewald*, which said it would be a "flagrant disregard of individuals' rights" to "deliberately deceive, or even lull" a person into incriminating themselves in a criminal investigation being pursued under the guise of a civil one. 987

F.2d at 534. The Eighth Circuit was referring to the criminal defendant's argument that he was the victim of a criminal investigation being pursued in the guise of a civil tax audit. *Id.* The court rejected the argument and affirmed the district court's denial of suppression because there had been no deceit. *Id.* We applied virtually the same standard in *Robson*, where we held that suppression was not appropriate in the absence of affirmative misrepresentations. 477 F.2d at 17-18.

[12] In this case, the SEC made no affirmative misrepresentations. The SEC did advise defendants of the possibility of criminal prosecution. The SEC engaged in no tricks to deceive defendants into believing that the investigation was exclusively civil in nature. The SEC's Form 1662 explicitly warned defendants that the civil investigation could lead to criminal charges against them: "Information you give may be used against you in any federal . . . civil or criminal proceeding brought by the Commission or any other agency." Defendants were represented by counsel, and the government provided counsel, so far as this record reflects, with accurate information. The standard we laid down in *Robson* was not violated.

The defendant-appellees point to a number of collateral facts they argue demonstrate trickery or deliberate misleading. They argue the SEC Staff Attorney affirmatively misled Stringer's attorney when, in response to the attorney's question about other agency involvement, she directed him to the provision in Form 1662 that warned that the SEC would likely turn over to the USAO evidence it collected at the depositions. The Staff Attorney, during the deposition taken in Portland, declined to direct defense counsel to a specific U.S. Attorney's Office, which would have been the Portland Office, but there was nothing false or misleading in her response that it was up to the defendant to decide where to direct his inquiries.

[13] The defendant-appellees also point to the Staff Attorney's request to the court reporters not to mention the AUSA

in the presence of defendants' attorneys. While this indicates an intent to prevent disclosure to defendants of the actual criminal investigation, the possibility of criminal investigation should have been well known to both the defendants and their counsel. The request to the court reporters to, in effect, mind their own business did not mislead or misinform defendants about the existence of an investigation. Thus, to the extent that the Fourth Amendment may have been implicated by the dual investigation, the district court erred in concluding that the government's actions in this case constituted an unreasonable search or seizure.

## B. Interference with Samper's attorney-client relationship

The district court concluded that the government violated defendant Samper's due process rights when it obtained evidence about the "Swedish Drop Shipment" from Samper's attorney, knowing that she had a conflict of interest. *Stringer*, 408 F. Supp. 2d at 1092. The government argues that it did not deliberately intrude into Samper's attorney-client relationship because all that it did was receive information that Samper's attorney offered the government, wholly independent of any government conduct.

**[14]** We have held that "government interference with a defendant's relationship with his attorney may render counsel's assistance so ineffective as to violate . . . his Fifth Amendment right to due process of law." *United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980). " '[A] claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice.' " *United States v. Haynes*, 216 F.3d 789, 797 (9th Cir. 2000) (quoting *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996)). A claim of government interference with the attorney-client relationship has three elements: (1) the government was objectively aware of an ongoing, per-

sonal attorney-client relationship; (2) the government deliberately intruded into that relationship; and (3), as a result, the defendant suffered actual and substantial prejudice. *Voigt*, 89 F.3d at 1067.

Most cases finding deliberate intrusion into the attorney-client relationship involve government informants who somehow penetrate the attorney-client relationship to obtain confidential or privileged information, and then feed that information to the government. *See, e.g.*, *Haynes*, 216 F.3d at 793-94. In *Haynes*, the defendant's attorney's investigator served as a paid informant for the government. *Id.* at 792. In *United States v. Marshank*, 777 F. Supp. 1507, 1519-1520 (N.D. Cal. 1991), the defendant's attorney served as an unpaid informant for the government by providing the government confidential client information on a regular basis. In contrast, we have held that the government's asking a defendant's former attorney to turn over privileged information does not constitute deliberate intrusion on the part of the government when the attorney complies. *See United States v. Rogers*, 751 F.2d 1074, 1080 (9th Cir. 1985). "The fact that the attorney failed to assert the ethical obligation does not transform [the government's] investigation into governmental misconduct." *Id.*

[15] For similar reasons, there was no deliberate government interference here. The government did not deliberately intrude into the relationship between Samper and Rosenbaum when it accepted potentially incriminating evidence from Rosenbaum, nor was Rosenbaum a government informant whom the government sought out. *Cf. Haynes*, 216 F.3d at 793-94. In fact, in Form 1662, the government explicitly warned Samper that "[y]ou may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's." The conflict resulted from Rosenbaum's decision, wholly independent of the gov-

ernment, to represent FLIR and Samper. Samper had full knowledge of a potential conflict and consented to the representation. There was no impropriety on the government's part.

**[16]** Indeed, had the government contacted Samper directly to warn him about the conflict, bypassing his attorney, the government would have engaged in conduct that itself may have amounted to interference. *Cf.* Or. Rules of Prof'l Conduct R. 4.2; Model Rules of Prof'l Conduct R. 4.2. The government's receipt of evidence from counsel intended to assist one client, but that also tended to incriminate another, was not an intrusion or intentional interference with the attorney-client relationship and did not justify dismissal of the indictment or suppression of the evidence of the "Swedish Drop Shipment."

## IV. Conclusion

For the foregoing reasons, we conclude that there was no deception or affirmative misconduct on the part of the government in the course of the SEC and U.S. Attorney investigations that warranted dismissal of the indictment or suppression of any of the evidence in question. In addition, defendants' Fifth Amendment rights were not violated.

The panel shall retain jurisdiction over any subsequent appeal in this matter.

The judgment of the district court dismissing the indictment is **VACATED**. The district court's suppression ruling is **REVERSED**. The case is **REMANDED** for further proceedings.